## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SAMUEL A. DAVIS,

              Plaintiff,

v.

MONICA RINALDI, ET AL.,

              Defendants.

Civil Action No.
3:19-cv-504 (CSH)

**OCTOBER 31, 2019**

## <u>INITIAL REVIEW ORDER</u>

**HAIGHT, Senior District Judge:**

Plaintiff Samuel A. Davis, a convicted prisoner currently incarcerated at the Cheshire Correctional Institution, has filed a civil rights complaint *pro se* pursuant to 42 U.S.C. § 1983. Doc. 1. This Initial Review Order is based upon his Amended Complaint. *See* Doc. 8 ("Am. Compl."). Plaintiff alleges that, in their individual and official capacities, Deputy Commissioner Monica Rinaldi; District Administrator Angel Quiros; Director of Population Management Maigo; Administrative Segregation Hearing Officer Martucci; Warden Mulligan; Deputy Warden Roach; Captains Burgos and Johnson; Lieutenants Roy, Valentin, McCreary and Acus; and Correctional Officers LaMountain, Koza, and Peterson (1) violated his Fourteenth Amendment right to procedural due process, and (2) subjected him to cruel and unusual punishment in violation of the Eighth Amendment. Am. Compl. ¶¶ 4–19; *id.* at 14–25.[1] He seeks a declaratory judgment, monetary

---

[1] Paragraph numbering refers to those on pages 2 through 14 of the Amended Complaint unless otherwise indicated.

1

damages, and an injunction to clear his disciplinary record. *Id.* at 25–28. For the following reasons, his Complaint is dismissed in part.

## I.     STANDARD OF REVIEW

Under 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint and dismiss any portion that "(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b)(1)–(2) (2012). Although highly detailed allegations are not required, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[2] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than the unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

"[W]hether a complaint states a plausible claim for relief will [ultimately] . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663–64. When "well-pleaded factual allegations" are present, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement

---

[2]     The Second Circuit has consistently adhered to the United States Supreme Court's plausibility standard set forth in *Iqbal*. *See, e.g.*, *Giunta v. Dingman,* 893 F.3d 73, 79 (2d Cir. 2018); *Bd.-Tech Elec. Co. v. Eaton Corp.*, 737 F. App'x 556, 558 (2d Cir. 2018); *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 94 (2d Cir. 2017).

to relief." *Id.* at 679. Factual disputes do not factor into a plausibility analysis under *Iqbal* and its progeny.

"Although all allegations contained in the complaint are assumed to be true, this tenet is 'inapplicable to legal conclusions.'" *LaMagna v. Brown*, 474 F. App'x 788, 789 (2d Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678); *see also Amaker v. New York State Dept. of Corr. Servs.*, 435 F. App'x 52, 54 (2d Cir. 2011) (same). Accordingly, the Court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks omitted)). Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

With respect to *pro se* litigants, it is well-established that "[p]ro se submissions are reviewed with special solicitude, and 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Matheson v. Deutsche Bank Nat'l Tr. Co.*, 706 F. App'x 24, 26 (2d Cir. 2017) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (*per curiam*)); *see also Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (same); *Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants); *Boykin v. KeyCorp.*, 521 F.3d 202, 214 (2d Cir. 2008) ("A document filed *pro se* is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (declaring that where the plaintiff proceeds *pro se*, a court is "obliged to construe his pleadings liberally" (quoting

*McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)); *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (In reviewing a *pro se* complaint, the court must assume the truth of the allegations, and interpret them liberally to "raise the strongest arguments [they] suggest[].").

Despite being subject to liberal interpretation, a *pro se* plaintiff's complaint still must "state a claim to relief that is plausible on its face." *Mancuso v. Hynes*, 379 F. App'x 60, 61 (2d Cir. 2010) (quoting *Iqbal,* 556 U.S. at 678). Therefore, even in a *pro se* case, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (citation and internal quotation marks omitted). Nor may the Court "invent factual allegations" that the plaintiff has not pleaded. *Id.*

## II.    FACTUAL ALLEGATIONS

These factual allegations, accepted as true only for the purposes of this Order, are taken from the Amended Complaint and its exhibits.

Plaintiff was an inmate at MacDougall Correctional Institution ("MacDougall"), of which Deputy Warden Roach is responsible for overseeing daily operations. Am. Compl. ¶¶ 3, 9. On April 19, 2018, prison officials transported Plaintiff from the restrictive housing unit ("RHU") at MacDougall to the University of Connecticut Health Center for a medical appointment. *Id.* ¶¶ 22–23. Before leaving, Plaintiff spoke to Captain Johnson, who was the third shift captain during that day's morning, regarding "issues that he had been having with C/O LaMountain." *Id.* ¶ 23. Captain Burgos was the shift commander on this day, meaning he is "responsible for everything that happens on his watch." *Id.* ¶ 10. Lieutenant Valentin was the shift supervisor at this time and similarly responsible. *Id.* ¶ 13.

Upon his return later that day at approximately 7:00 p.m., he was placed in the "Bullpen" in

4

the admitting and processing ("A & P") area and waited to be strip-searched. *Id.* ¶ 24. While waiting, Officer LaMountain arrived to escort him back to the RHU. *Id.* LaMountain told Plaintiff to "get the F*** in there" and hit him twice in the side. *Id.* Plaintiff swore at him, and then LaMountain grabbed Plaintiff and attempted to "body slam him." *Id.* Plaintiff wrapped his arms around LaMountain in an effort to prevent LaMountain from "body slamming him" and potentially causing him to "bust his head on the floor." *Id.* Plaintiff's body hit the ground, and LaMountain continued to hit him a few more times. *Id.* Officers Koza and Peterson arrived at the scene. *Id.*

At 7:06 p.m., officers called a "Code Orange," which signals that an assault on a staff member has occurred. *Id.* ¶ 25. Officer Koza grabbed Plaintiff and started hitting him with closed fists. *Id.* Officer Peterson then started kneeing Plaintiff in the side. *Id.* ¶ 26. East Sector Supervisor and Lieutenant McCreary then twice administered a chemical agent to Plaintiff's face to gain control of him. *Id.* ¶ 14; *id.* at 18.

Plaintiff was charged with assault on a peace officer and breach of peace in connection with the April 19, 2018, incident (the "Incident") with LaMountain, Koza, and Peterson. *Id.* ¶ 40. The charges were dismissed on January 24, 2019, due to insufficient evidence. *Id.* ¶ 57.

On the day of the Incident, Plaintiff went to the medical unit after complaining of severe pain in his shoulder and side, as well as problems with his eye and major migraine headaches. *Id.* ¶ 27. He was then taken back to RHU and placed in in-cell restraints. *Id.* ¶ 28. The in-cell restraints are chained to a black box in an area of the cell where he could not use the bathroom. *Id.* Officers occasionally asked Plaintiff if he needed to use the bathroom but would leave the restraints on. *Id.* The following day, on April 20, 2019, prison officials transferred Plaintiff to Northern Correctional Institution, where inmates are confined in their cells for twenty-three hours a day with one hour of

exercise, on administrative segregation status. *Id.* ¶¶ 4, 29.

On May 17, 2018, Plaintiff went to his administrative segregation hearing, which had been conducted by Officer Martucci. *Id.* ¶¶ 7, 42. Lieutenant Acus was the disciplinary hearing officer at the hearing, who was supposed to ensure Plaintiff received a fair hearing. *Id.* ¶ 15. Director of Population Management Maigo was also involved in authorizing the placement. *Id.* ¶ 6. Plaintiff appealed his administrative segregation placement on May 23, 2018. *Id.* ¶ 43. Deputy Commissioner Monica Rinaldi responded to the appeal on June 27, 2018, concluding that the totality of the circumstances—which indicated that Plaintiff was a threat to others—justified his placement. *Id.* ¶ 44.

Plaintiff filed a series of grievances that were eventually denied concerning the alleged assault, subjection to in-cell restraints, and his placement into administrative segregation over the next few months. For example, on May 16, 2018, Plaintiff filed a grievance against Lt. Roy for not investigating the Incident. *Id.* ¶ 34. Lt. Roy was supposedly in the A & P area at the time of the Incident and oversees security and investigations. *Id.* ¶¶ 12, 34. Additionally, on May 22, 2018, Plaintiff filed a grievance against Mulligan for not responding to his five previous requests that LaMountain was threatening and harassing Plaintiff while he was in the RHU. *Id.* ¶ 36. It was usually Warden Mulligan who denied his grievances; and, if Plaintiff appealed these denials, District Administrator of Prisons Angel Quiros denied his appeals. As a result of these grievances and appeals, Plaintiff contends that he has exhausted the administrative remedies for all of his issues. *Id.* ¶ 58.

## III.  DISCUSSION

Plaintiff raises two types of claims in the Amended Complaint.  First, he alleges that Defendants Rinaldi, Quiros, Maigo, Martucci, Mulligan, Roach, Burgos, Acus, McCreary, and Roy violated his Fourteenth Amendment right to procedural due process.  Am. Compl. at 14 ¶¶ 1–10. Second, he alleges that Defendants Rinaldi, Qurios, Mulligan, Roach, Burgos, Johnson, Valentin, McCreary, LaMountain, Koza, and Peterson subjected him to cruel and unusual punishment in violation of the Eighth Amendment.  *Id.* at 19 ¶¶ 1–11.

### A.    Official Capacity Claims and Damages

As to individual defendants acting in their *official* capacities, "the eleventh amendment immunity protects state officials sued for damages."  *Minotti v. Lensink*, 798 F.2d 607, 609 (2d Cir. 1986) (citing *Kentucky v. Graham*, 473 U.S. 159, 169–70 (1985)); *see also Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Quern v. Jordan*, 440 U.S. 332, 342 (1979) (holding that claims for damages against defendants in their official capacities are barred by the Eleventh Amendment).  To the extent that Plaintiff seeks damages from state officials in their official capacity, his § 1983 claims are barred by the Eleventh Amendment and will be dismissed.[3]

### B.    Request for Declaratory Judgment and Injunctive Relief

Plaintiff also seeks a declaratory judgment and injunctive relief.  Am. Compl. at  25–26. Declaratory relief operates prospectively "to enable parties to adjudicate disputes before either side

---

[3]  If a § 1983 suit against a state official in his or her *official* capacity seeks *money damages*, the state is deemed to be the real party in interest because an award of damages would be paid from the state treasury.  *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48–49 (1994).  Under such circumstances, the action is deemed to be against the state so that the state official is entitled to Eleventh Amendment immunity.  *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

suffers great damage." *In re Combustion Equip. Assocs., Inc.*, 838 F.2d 35, 37 (2d Cir. 1988).  In particular, "[t]o obtain prospective relief, such as a declaratory judgment or an injunction, a plaintiff must show, *inter alia*, 'a sufficient likelihood that he [or she] will again be wronged in a similar way.'" *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983), *cert. denied*, 568 U.S. 1212 (2013)).  "That is, a plaintiff must demonstrate a 'certainly impending' future injury." *Marcavage*, 689 F.3d at 103 (citing *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

As for injunctions, the Supreme Court held that the Eleventh Amendment does not prohibit the issuance of an injunction. *Ex Parte Young*, 209 U.S. 123, 160 (1908).  Where a plaintiff invokes the doctrine established in *Ex Parte Young*, the suit "is not deemed to be an action against the state. Instead, such an action proceeds against the state officer who, by acting contrary to federal law, acts without authority and therefore, under these circumstances, does not act in a representative capacity." *Lowrance v. Coughlin*, 862 F. Supp. 1090, 1097 (S.D.N.Y.1994) (footnote omitted).

In this action, Plaintiff brings claims concerning alleged *prior* violations of constitutional law—*i.e.*, incidents that occurred in 2018.  Thus, a request for declaratory judgment cannot properly be characterized as "prospective," because Plaintiff does not allege how such relief would remedy a future constitutional violation by these defendants.  The claims concern past problems and include no alleged ongoing or future suffering.  In sum, Plaintiff has not identified any prospective legal relationships or issues that require resolution via declaratory relief.  For that reason, all claims for declaratory relief will be dismissed.

On the other hand, the law will not bar *injunctive* relief here as Plaintiff seeks prospective relief.  Plaintiff seeks an order from the Court directing Defendants Rinaldi and Quiros to expunge

the "disciplinary conviction" mentioned in this case from his prison record. Am. Compl. at 26. However, this leaves the question of whether Plaintiff's request for injunctive relief is cognizable, which the Court will address *infra* in connection with his Fourteenth Amendment procedural due process challenge to the issuance of the disciplinary conviction.

## C.    Procedural Due Process Claims under the Fourteenth Amendment

Plaintiff's procedural due process claims concern his placement into administrative segregation without a fair hearing; being subject to in-cell restraints; certain prison officials' alleged failure to investigate the Incident; and deployment of a chemical agent in violation of prison directives. The Court will first provide a broad overview of procedural due process and then address each of these procedural due process claims in turn.

The standard analysis for a procedural due process claim "proceeds in two steps: a court first ask[s] whether there exists a liberty or property interest of which a person has been deprived, and if so . . . whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (*per curiam*).

In the prison context, which involves persons whose liberty interests have already been severely restricted because of their confinement in a prison, a prisoner plaintiff cannot show a cognizable deprivation of "liberty" unless he can show that he was subject to an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The Supreme Court further clarified the principle in *Wilkinson v. Austin*, 545 U.S. 209 (2005): "After *Sandin*, it is clear that the touchstone of the inquiry into the existence of a protected state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in

relation to the ordinary incidents of prison life.'" *Id.* at 223.  The Second Circuit has also explained

that courts must examine the actual punishment received, as well as the conditions and duration of

the punishment.  *See Davis v. Barrett*, 576 F.3d 129, 133–34 (2d Cir. 2009) (*per curiam*); *Palmer*

*v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004).

Assuming a protected interest exists, the Court must consider whether the inmate received

process that was constitutionally due.  This often depends on context.  The procedural protections

that are due to a prison inmate facing a disciplinary hearing, for example, are not as expansive as the

due process protections for a criminal defendant standing trial.  *See Wolff v. McDonnell*, 418 U.S.

539, 556 (1973); *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004).  Of course, protections are still in

place for a disciplinary hearing.  An inmate must be given "advance written notice of the charges

against him; a hearing affording him a reasonable opportunity to call witnesses and present

documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition,

including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira*, 380 F.3d

at 69 (citing *Wolff*, 418 U.S. at 563–67).  Moreover, there must be at least some evidence to support

the findings made in the disciplinary hearing.  *See Washington v. Gonyea*, 538 F. App'x 23, 25 (2d

Cir. 2013).

###     1.     Administration Segregation Hearing[4]

As a result of the Incident, Plaintiff was subjected to placement on administrative segregation

---

[4] Plaintiff also references a disciplinary hearing, specifically in connection to the claim that
Defendant Acus did not afford him a fair disciplinary hearing.  Am. Compl. at 17 ¶ 8.  Based on
another reference to Defendant Acus as the disciplinary hearing officer "overseeing the Plaintiff's
segregation hearing," *id.* ¶ 15, the Court concludes that Plaintiff's references to a disciplinary hearing
and the administrative segregation hearing both refer to the same hearing on May 17, 2018, *id.* ¶ 42.

status for up to five months.[5]  Plaintiff alleges that he was placed on administrative segregation status

on April 20, 2018, and had his administrative segregation hearing on May 17, 2018.  Am. Compl.

¶¶ 29, 42.  He was given a hearing, but the hearing procedures were inadequate.  He accuses

Defendant Maigo of authorizing the placement without giving Plaintiff a hearing or notice of the

hearing, *id.* at 15; Defendant Martucci for refusing to allow witnesses to testify on Plaintiff's behalf

at the hearing, *id.* at 16; and Defendant Acus for not affording him a fair disciplinary hearing by not

reviewing the video and interviewing witnesses regarding the Incident, *id.* at 17–18.[6]

    This Court had considered the question of whether administrative segregation in Connecticut

raised a protected liberty interest in *Ellerbe v. Jason*, No. 12-cv-580 (MPS), 2015 WL 1064739 (D.

Conn. Mar. 11, 2015).  In *Ellerbe*, Judge Shea reasoned:

> The Constitution itself does not give an inmate a liberty interest in
> avoiding more restrictive confinement such as Punitive Segregation
> or Administrative Segregation. *Wilkinson v. Austin*, 545 U.S. 209,
> 221–22, 125 S. Ct. 2384 (2005).  But state policies regarding
> conditions of confinement may create a liberty interest in avoiding
> more restrictive confinement.  *Id.*  Such an interest may arise if
> "statutes or regulations require, in 'language of an unmistakably
> mandatory character,' that a prisoner not suffer a particular
> deprivation absent specified predicates." *Tellier v. Fields*, 280 F.3d
> 69, 81 (2d Cir. 2000) (quoting *Welch v. Bartlett*, 196 F.3d 389, 392
> (2d Cir. 1999)).

*Ellerbe*, 2015 WL 1064739, at *3.

---

[5] Plaintiff does not specify exactly how long he was on administrative segregation status. The Court's estimate of five months is derived from Plaintiff's claim of his initial placement at Northern Correctional Institution on April 20, 2018, Am. Compl. ¶ 29, and a grievance form suggesting he returned from Northern in September 2018, *id.* at 48.

[6] Plaintiff also accuses Defendant Mulligan of not "affording the Plaintiff a fair[] and just hearing process." Am. Compl. at 16 ¶ 5. However, the Amended Complaint does not contain facts showing that Mulligan had any role in the hearing, and so the Court has no basis to evaluate this particular claim against Mulligan.

Judge Shea went on to hold that Administrative Directive 9.4, promulgated by the Connecticut Department of Correction, provides "the basis for a liberty interest in avoiding Administrative Segregation." *Id.*; *see* Conn. Dep't Corr. Admin. Dir. 9.4 § 3(B). This liberty interest was invoked where the inmate had spent 243 days in administrative segregation as punishment. *Ellerbe*, 2015 WL 1064739, at *5; *see also Palmer v. Richards*, 364 F.3d 60, 64–65 (2d Cir. 2004) ("Where the plaintiff was confined for an intermediate duration—between 101 and 305 days—'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required.").

Based on the Court's estimations that Plaintiff returned from administrative segregation in September 2018, the Amended Complaint shows that he was committed to administrative segregation for more than 101 days. "Such a period of segregated confinement would ordinarily preclude dismissing a claim without fact-finding." *Ellerbe*, 2015 WL 1064739, at *5. Assuming the Court's estimations of the period of confinement are correct, Plaintiff may meet the first *Sandin* requirement of a deprivation of a liberty interest imposing an atypical and significant hardship; and, further fact-finding is needed.

Moving on to the second requirement, the Court must examine whether the procedures in place were constitutionally sufficient. The purpose of confinement matters greatly. "[N]otwithstanding the label 'Administrative Segregation,' if 'the purpose of more restrictive confinement is disciplinary or punitive,' then the heightened procedural requirements of *Wolff v. McDonnell*, 418 U.S. 539 (1974) apply." *Id.* If such is the purpose, the Supreme Court has opined that inmates "should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional

12

goals." *Wolff*, 418 U.S. at 566.

The Court infers from the Plaintiff's cruel and unusual punishment claims that he believes the placement on administrative segregation status was punitive. At this stage then, the Court will presume that Plaintiff was entitled to *Wolff* procedures during the administrative segregation hearing. According to Plaintiff, Defendants Maigo, Martucci, and Acus did not provide him notice of the hearing, allow him to call witnesses, or present evidence. Am. Compl. at 15–16, 17. Absent evidence that affording Plaintiff these procedures was not unduly hazardous to institutional safety or correctional goals, Defendants did not meet the *Wolff* standard. The second step of the *Sandin* test is thus met here. Plaintiff has therefore stated a plausible claim that Defendants Maigo, Martucci, and Acus violated his procedural due process rights with respect to his confinement on administrative segregation status.

### 2.    In-Cell Restraints

After the Incident, Plaintiff was subjected to in-cell restraints. Am. Compl. ¶ 28. Given that he was transferred to Northern Correctional Institution the next day, the Court presumes Plaintiff was subject to in-cell restraints for approximately twenty-four hours. *See id.* ¶ 29. He argues that this was imposed upon him without cause, accusing Defendant Roach of signing off on subjecting Plaintiff to in-cell restraints, *id.* at 16–17, and Defendant Burgos of authorizing Plaintiff's in-cell restraints without examining the video and witnesses in connection with the Incident, *id.* at 17.

In-cell restraint status for a day does not implicate an atypical and significant hardship upon Plaintiff, as required by *Sandin*. "Plaintiff's 'in-cell restraint' status, lasting at most one full day, was brief in comparison to restraint or confinement found in 'atypical and significant hardship' cases." *Alston v. Daniels*, No. 15-cv-669 (CSH), 2015 WL 7257896, at *7 (D. Conn. Nov. 17, 2015); *see*

*also Alston v. Butkiewicus*, No. 09-cv-207 (CSH), 2012 WL 6093887, at *12 (D. Conn. Dec. 7, 2012) ("Confinement on in-cell restraint status or in four-point restraints does not rise to the level of a substantive due process violation."). Plaintiff has not sufficiently alleged facts implicating a liberty interest here, and the Court need not move on to the second step of the *Sandin* analysis. Accordingly, the procedural due process claims against Defendants Roach and Burgos are dismissed with respect to subjecting Plaintiff to in-cell restraints.

### 3.    Failure to Investigate

All of Plaintiff's allegations generally accuse prison officials of failing to fully investigate the Incident. Where these allegations have resulted in consequences that are potentially disciplinary in character—*e.g.*, administrative segregation status and in-cell restraints—the Court has addressed them separately *infra*. This subsection only examines Plaintiff's claims that broadly assert a failure to follow process in connection with his requests for prison officials to fully investigate the Incident. Specifically, Plaintiff accuses Defendants Rinaldi and Quiros of denying his grievance appeals without investigating the Incident, Am. Compl. at 14, 15; Defendant Mulligan for denying Plaintiff's grievances without viewing the video of the Incident, *id.* at 16; Defendant Roach of the same "because he was in charge on the day the incident happened," *id.*; Defendant Burgos for signing off on an unspecified disciplinary report without viewing the video or interviewing witnesses in connection with the Incident, *id.* at 17; and Defendant Roy for failing to write a report of the Incident, *id.* at 18–19.

Plaintiff does not have a protected liberty interest in having correctional officials investigate his complaints, through the grievance process or otherwise. "Prisoners have no constitutionally protected right to have prison officials comply with grievance procedures or even to respond to

grievances." *Green v. Martin*, 224 F. Supp. 3d 154, 169–70 (D. Conn. 2016); *see also Kalican v. Dzurenda*, No. 12-cv-1009 (SRU), 2015 WL 1806561, at *6 (D. Conn. Apr. 21, 2015) (finding no constitutional entitlement to have prison officials comply with grievance procedures or respond to grievances); *Davila v. Messier*, No. 13-cv-81 (SRU), 2014 WL 4638854, at *8 (D. Conn. Sept. 17, 2014) ("[The inmate] does not have a procedural due process interest in having his claim investigated in a manner he deems appropriate."); *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 344 (N.D.N.Y. 2010) ("[P]risoners do not have a due process right to a thorough investigation of grievances."); *Swift v. Tweddell*, 582 F. Supp. 2d 437, 445–46 (W.D.N.Y. 2008) ("It is well established . . . that inmate grievances procedures are undertaken voluntarily by the states, that they are not constitutionally required, and accordingly that a failure to process, investigate or respond to a prisoner's grievance does not in itself give rise to a constitutional claim."); *Fernandez v. Armstrong*, No. 02-cv-2252 (CFD), 2005 WL 733664, at *9 (D. Conn. Mar. 30, 2005) ("This district has previously held that failure of a correctional official to comply with the institutional grievance procedures is not cognizable in an action filed pursuant to 42 U.S.C. § 1983, unless the action caused the denial of a constitutionally or federally protected right.").

Non-compliance with administrative directives does not create a liberty interest, either. "The failure to comply with state-created procedures does not in and of itself create a protected liberty interest that would implicate due process rights." *Green*, 224 F. Supp. 3d at 170 (citing *Fernandez*, 2005 WL 733664, at *10 (holding that "the Supreme Court has held that mandatory language in a prison directive or regulation does not in and of itself create a liberty interest" (citing *Sandin v. Conner*, 515 U.S. 472, 483 (1995)))).

Here, Plaintiff accuses Rinaldi, Quiros, Mulligan, Roach, and Burgos of failing to investigate

15

and Roy of failing to write an investigative report in violation of Administrative Directive 1.10 § 6(b). Am. Compl. at 14–19. As prison inmates do not have the right to an investigation of their complaints, even if state procedure directs a report to be made, there is not a protected liberty interest here. Accordingly, Plaintiff's claims against these defendants for procedural due process violations are dismissed.

In connection with these claims is Plaintiff's request for injunctive relief in the form of directing Rinaldi and Quiros to expunge the Incident from his institutional record. *Id.* at 26. Presumably, he believes that if Rinaldi and Quiros had done a thorough investigation of the Incident, he would not have the Incident on his record. His claim for injunctive relief must be dismissed, however, because he has failed to state a plausible claim with respect to the procedural due process claims against these two defendants.

### 4. Deployment of Chemical Agent

Plaintiff also claims a procedural due process violation where Defendant McCreary deployed more than the needed amount of chemical agent to gain control of Plaintiff in violation of an administrative directive. Am. Compl. at 18. He argues that such deployment of a chemical agent was not in compliance with Administrative Directive 6.5 § 4(B), which outlines the procedures to be used for a planned use of physical force. *Id.*

The Amended Complaint does not allege facts showing that McCreary's use of the chemical agent was a planned use of force. He used the chemical agent in response to the Incident, constituting a use of force in an ongoing emergency situation involving an altercation between an inmate and several correctional officers. Thus, the administrative directive cited by Plaintiff does not apply to McCreary's deployment of the chemical agent.

In any case, such violation would not give rise to a protected liberty interest. "State prison directives do not confer any constitutionally protected rights on inmates . . . and Fourteenth Amendment due process protections are not implicated by the defendants' alleged failure to comply with administrative directives." *Riddick v. Chevalier*, No. 11-cv-1555 (SRU), 2013 WL 4823153, at *4 (D. Conn. Sept. 9, 2013) (finding that prison directives, which are designed primarily to guide correctional staff, do not confer rights on inmates (citing, *inter alia*, *Sandin*, 515 U.S. at 481–82)); *Rhodes v. Hoy*, No. 05-cv-836, 2007 WL 1343649, at *2 (N.D.N.Y. May 5, 2017) (holding that due process is not implicated by a failure to comply with institutional administrative procedures). Accordingly, the Fourteenth Amendment procedural due process claim related to McCreary's alleged failure to comply with Administrative Directive 6.5's instructions is dismissed.

**D.     Cruel and Unusual Punishment Claims Under the Eighth Amendment**

Plaintiff accuses various prison officials of violating the Eighth Amendment right against cruel and unusual punishment due to having been subjected to administrative segregation, in-cell restraints, and excessive force deployment in an assault by three officers and by a chemical agent sprayed twice on Plaintiff's face. The Court will examine each of these claims herein.

A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment when the official's action involves the "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)). To succeed on an Eighth Amendment claim, a plaintiff "must show (1) a deprivation that is objectively, sufficiently serious . . . and (2) a sufficiently culpable state of mind on the part of the defendant official." *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) (internal quotation marks omitted). The deprivations must be examined in light of contemporary standards of decency to

determine whether they are sufficiently serious. *See Helling v. McKinney*, 509 U.S. 25, 35–36 (1993); *see also Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Subjectively, the plaintiff must show that the defendants "know[] that inmates face a substantial risk of serious harm and disregard[] that risk." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

### 1.    Administrative Segregation

As stated *supra*, the Court estimates that Plaintiff spent up to five months in administrative segregation at Northern Correctional Institution. This entailed twenty-three hours of confinement within his cell and allowed for only one hour of exercise. Am. Compl. ¶ 29. In connection with his administrative segregation, he accuses Rinaldi of denying his administrative segregation appeal, *id.* at 19; Quiros of denying the grievance appeals and, thus, subjecting him to administrative segregation, as well, *id.* at 20; Mulligan of sending him to administrative segregation, *id.*; and, Roach of approving his transfer to administrative segregation; *id.* at 21.

While "[c]onfinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards," *Hutto v. Finney*, 437 U.S. 678, 685 (1978), it does not necessarily follow that all imprisonment is cruel and unusual, *see Tuttle v. Semple*, No. 17-cv-1507 (JAM), 2018 WL 705004, at *3 (D. Conn. Feb. 5, 2018). As noted *supra*, the Court must determine if there is (1) an objectively serious deprivation and (2) a subjectively culpable state on the part of the defendant official to determine if an Eighth Amendment violation exists. *See Gonzalez v. Hasty*, 802 F.3d 212, 224 (2d Cir. 2015).

Twenty-three hours of confinement does not in itself constitute an objectively serious deprivation. Plaintiff has not alleged that "the conditions, either alone or in combination, pose an unreasonable risk of serious damage to [an inmate's] health." *Walker v. Schult*, 717 F.3d 119, 125

(2d Cir. 2013) (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  "Prisoners have no right to be housed in comfortable surroundings."  *Mercado v. Dep't of Corr.*, No. 16-cv-1622 (VLB), 2017 WL 1095023, at *6 (D. Conn. Mar. 23, 2017) (finding no Eighth Amendment violation where Plaintiff complained about twenty-hours of confinement per day at MacDougall-Walker Correctional Institution).  The Supreme Court has held that restrictions do not violate the Eighth Amendment proscription against cruel and unusual punishment unless they are "totally without penological justification," "grossly disproportionate," or "involve the unnecessary and wanton infliction of pain." *Rhodes*, 452 U.S. at 346.  "To the extent that such conditions are restrictive or even harsh, they are part of the penalty that criminal offenders pay for their offenses against society."  *Id.* at 347.  A prisoner's conditions of confinement does need to meet "minimal civilized measures of life's necessities," *Wilson v. Seiter*, 501 U.S. 294, 298 (1991), but the Plaintiff does not allege that prison officials deprived him of his "basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety" while on administrative segregation status, *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989); *see also Jackson v. Heer*, 322 F. Supp. 3d 406, 412 (W.D.N.Y. 2018) (finding alleged "adverse conditions," including "confinement to his cell for 23 hours a day [and] loss of visitation and telephone privileges" in the restrictive housing unit, were not sufficiently severe to meet the objective prong of the Eighth Amendment standard), *appeal dismissed*, No. 18-2637, 2019 WL 1062356 (2d Cir. Feb. 27, 2019).

Because Plaintiff has not pleaded an objectively serious deprivation here, Plaintiff's Eighth Amendment claims regarding his conditions on administrative segregation status are dismissed.

### 2.    In-Cell Restraints

Plaintiff was placed in in-cell restraints for approximately a day after he returned from the

medical unit on the day of the Incident. Am. Compl. ¶¶ 28–29. When subjected to in-cell restraints, Plaintiff was shackled to a black box in a part of the cell that consequently did not allow him to independently use the bathroom. *Id.* ¶ 28. Prison officials occasionally asked him if he needed to use the bathroom but would leave the restraints on when helping him. *Id.* Plaintiff claims that Quiros, Mulligan, and Roach were all responsible for subjecting him to in-cell restraints; *id.* at 20–21; and, Burgos and Valentin specifically for authorizing the use of in-cell restraints, *id.* at 22, 23.

"When reviewing the use of restraints under the Eighth Amendment, the court must consider the individual circumstances surrounding the use of restraints, including the length of time restraints were imposed and the objective sought to be served." *Butkiewicus*, 2012 WL 6093887, at \*11. Because "[m]aintaining order and security in a prison is a legitimate penological objective . . . the use of restraints that are reasonably related to maintaining prison order and security, without more, does not violate the Eighth Amendment." *Shehan v. Erfe*, No. 15-cv-1315 (MPS), 2017 WL 53691, at \*9 (D. Conn. Jan. 4, 2017); *see also Caballero v. Lantz*, No. 05-cv-140 (CFD), 2008 WL 638397, at \*3 (D. Conn. Mar. 5, 2008) ("The use of in-cell restraints in prisons is not prohibited by the Eighth Amendment and is certainly justified under many circumstances.").

Courts have also recognized some conditions that would rise to the level of a violation. *See, e.g.*, *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (noting that "a deprivation of bathroom breaks" while prisoner was handcuffed to a hitching post for seven hours "created a risk of particular discomfort and humiliation" and contributed to the punishment being cruel and unusual; also noting harm associated with being denied a change of clothing after defecating on oneself); *Caballero*, 2008 WL 638397, at \*3 (D. Conn. Mar. 5, 2008) (finding issues of material fact where prisoner claimed nine

20

hours in in-cell restraints forced him to defecate on himself but parties disagreed about whether he could make use of the bathroom facilities); *Atkins v. County of Orange*, 372 F. Supp. 2d 377, 406 (S.D.N.Y. 2005) (denying summary judgment for allegation that prison guard twice refused to provide female prisoner with a sanitary napkin), *aff'd on other grounds sub nom. Bellotto v. County of Orange*, 2007 WL 2808028 (2d Cir. Sep 26, 2007).

Plaintiff does not allege conditions that would be violative of the Eighth Amendment. He was subject to in-cell restraints for a relatively brief period of time. And, although he could not independently use the toilet, he does not allege that prison officials fully deprived him of the use, or refused to help him use, the toilet. There are no facts suggesting that he was forced to defecate or urinate himself or that he otherwise suffered any discomfort or humiliation from these conditions. In fact, he acknowledges that the guards checked in on him from time to time to see if he needed to use the bathroom. Am. Compl. ¶ 28.

However, Plaintiff has sufficiently alleged that there was not a legitimate safety or security basis for Plaintiff's placement. Taking his statements to be true, Plaintiff did not start the altercation at the heart of the Incident and did not fight back; he only acted to protect himself from bodily harm. *Id.* ¶ 24. He also alleges that he was not a threat to himself or anyone else immediately after the Incident. *Id.* at 13. Accordingly, the Court will permit Plaintiff's Eighth Amendment claims relating to his in-cell restraints to proceed against the defendants allegedly responsible for his placement: Quiros, Mulligan, Roach, Burgos, and Valentin.

### 3.    Excessive Force

Plaintiff also brings excessive force claims against four prison guards. It is generally accepted that "[u]njustified striking, beating, or infliction of bodily harm without cause will give rise

to liability for violation of the civil rights laws." 60 Am. Jur. 2d Penal and Correctional Institutions § 173 (2d ed. updated August 2015) (citing *King v. Blankenship*, 636 F.2d 70, 72 (4th Cir. 1980)). "While not 'every malevolent touch by a prison guard gives rise to a federal cause of action,' if the conduct reflects an unnecessary and wanton infliction of pain, the Eighth Amendment is violated." *Alston v. Delpeschio*, No. 15-cv-01672 (CSH), 2016 WL 3211805, at *4 (D. Conn. June 9, 2016) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9–10 (1992)). "[T]he core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7.

### a.    Assault

During what this opinion has referred to as the Incident, Plaintiff claims that LaMountain assaulted him without provocation while Plaintiff was waiting in the A & P area on a return from a medical appointment. Am. Compl. ¶ 24. According to Plaintiff, LaMountain appeared there to escort Plaintiff back, telling him to "get the F*** in there" and hitting him twice in the side. *Id.* LaMountain also ended up slamming Plaintiff to the ground. *Id.* Plaintiff wrapped his arms around LaMountain but claims he only did so to protect his body. *Id.* Koza and Peterson arrived at the scene. *Id.* Koza threw Plaintiff to the ground and hit him with closed fists. *Id.* ¶ 25. Peterson kneed Plaintiff on his side. *Id.* ¶ 26. He brings cruel and unusual punishment claims against LaMountain, Koza, and Peterson for the assault. *Id.* ¶¶ 24–25.

These facts, as alleged, state a sufficient claim of excessive force against LaMountain, Koza, and Peterson. They apparently inflicted unnecessary and wanton pain upon Plaintiff without cause. There appears to be no cause as LaMountain purportedly instigated the altercation. *Id.* ¶ 24. In addition, the force used was excessive given that Plaintiff did not fight back and only acted to protect

22

against bodily harm. *Id.* Koza and Peterson also struck Plaintiff when he was already on the ground and not resisting. *Id.* ¶¶ 24–26. Accordingly, Plaintiff's excessive force claims under the Eighth Amendment against LaMountain, Koza, and Peterson may proceed.

### b.    Deployment of Chemical Agent

During the Incident, McCreary appeared and deployed more than the amount of chemical agent needed to gain control of the Plaintiff during the Incident. Am. Compl. at 18. Specifically, McCreary sprayed Plaintiff twice in the face, which Plaintiff alleges was more than necessary. *Id.* Plaintiff's cruel and unusual punishment claim with respect to the deployment of a chemical agent is only against McCreary. *Id.* at 23.

"Courts considering the use of chemical agents have held that deployment of a chemical agent is an accepted means of controlling an unruly or disruptive inmate." *Butkiewicus*, 2012 WL 6093887, at *14; *see also, e.g.*, *Scroggins v. Davis*, 346 F. App'x 504, 505 (11th Cir. 2009) (finding use of chemical agent to subdue high-risk inmate was not excessive), *cert. denied*, 130 S. Ct. 1711 (2010); *Soto v. Dickey*, 744 F.2d 1260, 1271 (7th Cir. 1984) ("[T]he chemical agent was used for failure of the inmate to obey a direct order and the use of mace was a reasonable response to the institution's legitimate security concern."), *cert. denied*, 470 U.S. 1085 (1985). "When reviewing the use of a chemical agent against a recalcitrant inmate, the court can find a constitutional violation only where the use of the chemical agent is malicious and sadistic. That the use may have been objectively unreasonable is insufficient to establish an Eighth Amendment claim." *Carolina v. Pafumi*, No. 12-cv-163 (VLB), 2013 WL 1673108, at *3 (D. Conn. Apr. 17, 2013) (citing *Howard v. Nunley*, No. 06-cv-191 (NVW), 2010 WL 3785536, at *4 (E.D.Cal. Sept. 24, 2010) (considering use of chemical agent against inmate who deliberately violated direct orders)); *see also Tracy v.*

23

*Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010) (concluding that "a reasonable juror could find that the use of pepper spray deployed mere inches away from the face of a defendant already in handcuffs and offering no further active resistance constituted an unreasonable use of force"); *Alston*, 2015 WL 7257896, at *4 (holding that use of a chemical agent and tight shackles may, under certain circumstances, constitute an Eighth Amendment violation).

In connection with the administration of a chemical agent, it is unclear whether Plaintiff was unruly or disruptive by the time that McCreary appeared during the Incident. He claims that McCreary administered "more than the needed amount of Chemical Agent to gain control of the Plaintiff." Am. Compl. at 18. This could imply that one spray was sufficient, but also that prison officials needed to gain control over Plaintiff in the first place. It is also unclear when exactly McCreary sprayed Plaintiff in the face with a chemical agent during the altercation—*i.e.*, if he appeared when Plaintiff had his arms around LaMountain or when Plaintiff was already on the ground and assaulted by Koza and Peterson—or if there was a gap in time between the sprays that allowed McCreary to determine if a second spray was needed. *See Butkiewicus*, 2012 WL 6093887, at *14 (dismissing prisoner's excessive force claim where a chemical agent was deployed between five and seven times because Plaintiff continually refused to comply with orders). Further fact-finding will, of course, be needed. Taking Plaintiff's claim as true that more chemical agent than needed was used against him, though, the Court finds that he states a plausible claim for relief.

### 4.    Failure to Protect and Supervisory Liability

Lastly, Plaintiff asserts claims against Mulligan, Roach, Burgos, Johnson, Valentin, and McCreary for failing to protect him from the assault by LaMountain, Koza, and Peterson. Am. Compl. at 26. The Eighth Amendment requires prison officials to "take reasonable measures to

guarantee the safety of . . . inmates." *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984).

In the Second Circuit, claims of failure to protect are a subset of Eighth Amendment prison-condition claims, and are subject to the same analysis requiring demonstration of both the objective and subjective components of an Eighth Amendment claim. *See Dawes v. Walker*, 239 F.3d 489, 494 n.3 (2d Cir. 2001). "Deliberate indifference in the context of a failure to protect claim requires a showing that the prison official knew that the inmate faced a substantial risk of serious harm, and disregarded that risk by failing to take reasonable measures to abate." *Colman v. Vasquez*, 142 F. Supp. 2d 226, 237 (D. Conn. 2001) (citing *Farmer*, 511 U.S. at 846).

Plaintiff's claims against Mulligan, Burgos, Johnson, and McCreary for failure to protect in violation of the Eighth Amendment appear to meet these requirements. These officials apparently had advanced knowledge of a substantial risk to Plaintiff. Specifically, Plaintiff had written to Mulligan five times about being threatened and harassed by LaMountain and had also spoken in person with Johnson about problems he had been having with LaMountain. Am. Compl. at 9, 21. Johnson then passed on that information to Burgos. *Id.* at 22. According to one of Plaintiff's grievance forms, LaMountain had threatened to kill him. *Id.* at 32. Mulligan, Johnson, and Burgos allegedly did nothing about LaMountain's threats against Plaintiff, and then the threats materialized into the Incident.

As for McCreary, he appears to meet these requirements, as well, because he was present at the Incident and did not act to mitigate the risks to Plaintiff's health and safety. *Id.* at 18, 23. Assuming Plaintiff's recollection of the Incident was objectively apparent to those on the scene, McCreary would have seen that there was a substantial risk to Plaintiff due to LaMountain, Koza, and Peterson hitting Plaintiff even though Plaintiff was not fighting back. Instead of intervening and

lessening the risk, McCreary then administered chemical agent to "subdue" Plaintiff. *Id.*

However, Plaintiff's allegations against Roach and Valentin do not meet the bar for a plausible failure to protect claim. At most, Plaintiff alleges that Roach was "in charge" on the day of the Incident and that Valentin was the shift supervisor and "responsible for everything that happens on his shift." Am. Compl. at 21, 23. He does not allege that they had advanced knowledge or were present during the Incident. To the extent he raises a supervisory liability theory against these individuals, such claims would similarly fail. "It is well settled . . . that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks omitted); *see also Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir. 1973) (doctrine of *respondeat superior* does not suffice for claim of monetary damages under § 1983). His failure to protect claims cannot proceed against Roach and Valentin because Plaintiff has not alleged that they had personal involvement in the Incident or had advanced knowledge of circumstances that led to the Incident.

Accordingly, Plaintiff's failure to protect claims will proceed against Mulligan, Burgos, Johnson, and McCreary but will be dismissed against Roach and Valentin.

## IV.  CONCLUSION AND ORDER

Pursuant to 28 U.S. C. § 1915A, the Court has reviewed the *pro se* prisoner's civil complaint to determine which, if any, claims must be dismissed for failure to state claims upon which relief may be granted and/or attempts to obtain monetary relief against a defendant who is immune from such relief. Based on the foregoing, the Court sets forth its conclusion and Orders.

(1)  Plaintiff's requests for declaratory relief and injunctive relief are DENIED.

(2)  The Court DISMISSES all claims against Defendants Rinaldi and Roy. The Clerk is

26

directed to terminate these Defendants.

(3)  All claims against the remaining Defendants in their *official* capacities are DISMISSED.

(4)  The following plausible claims against the individual defendants in their *personal* capacities for damages may proceed:

> A.    Procedural due process violations against Maigo, Martucci, and Acus for Plaintiff's placement into administrative segregation without a fair hearing;
>
> B.    Cruel and unusual punishment claims against Quiros, Mulligan, Roach, Burgos, and Valentin for subjecting Plaintiff to in-cell restraints without a legitimate penological objective;
>
> C.    Cruel and unusual punishment claims against LaMountain, Koza, Peterson, and McCreary for excessive use of force; and
>
> D.    Cruel and unusual punishment claims against Mulligan, Burgos, Johnson, and McCreary for failure to protect Plaintiff from a substantial risk of harm.

(5)  The Clerk shall verify the current work addresses for Maigo, Martucci, Acus, Quiros, Mulligan, Roach, Burgos, Valentin, LaMountain, Koza, Peterson, and McCreary with the Department of Correction Office of Legal Affairs, mail a waiver of service of process request packet containing the Amended Complaint to each Defendant at the confirmed address within **twenty-one (21) days** of this Order, and report to the Court on the status of the waiver requests on the **thirty-fifth (35) day** after mailing.  If any Defendant fails to return the waiver request, the Clerk shall make

arrangements for in-person service on him/her by the U.S. Marshals Service, and he/she shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(6)  The Defendants shall file their response to the Amended Complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to them.  If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above.  They may also include any and all additional defenses permitted by the Federal Rules.

(7)  Discovery, pursuant to Federal Rules of Civil Procedure 26 to 37 shall be completed within **six months (180 days)** from the date of this Order.  Discovery requests need not be filed with the Court.

(8)  All motions for summary judgment shall be filed within **seven months (210 days**) from the date of this Order.

It is SO ORDERED.

Dated: New Haven, Connecticut
          October 31, 2019


                                        */s/ Charles S. Haight, Jr.*
                                        CHARLES S. HAIGHT, JR.
                                        Senior United States District Judge

28