UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

----------------------------------------------------------------   x
SAMUEL A. DAVIS,                                                     :
                                                                    :
                              Plaintiffs,                           :
                                                                    :
              v.                                                    :       19-CV-504 (SFR)
                                                                    :
MONICA RINALDI, ET AL.,                                             :
                                                                    :
                              Defendants.                           :
----------------------------------------------------------------   x

## MEMORANDUM & ORDER

Plaintiff Samuel Davis brought this action against multiple prison officials following an altercation that occurred while Davis was incarcerated at MacDougall-Walker Correctional Institution in 2018. Davis alleges an Eighth Amendment excessive force claim against Defendants LaMountain, Koza, Peterson, and McCreary; an Eighth Amendment failure to protect claim against Defendants Mulligan, Burgos, Johnson, and McCreary; and a Fourteenth Amendment due process claim against Defendants Maiga, Martucci, Acus, and Valentin.

Defendants move for summary judgment on the Eighth Amendment failure to protect claim for all Defendants except McCreary, and the Fourteenth Amendment due process claim for all Defendants. Defendants do not move for summary judgment on the Eighth Amendment excessive force claim. For the reasons set forth below, I hereby GRANT summary judgment on to the failure to protect claim for Defendant Mulligan and the due process claim for Defendants Acus, Maiga, and Martucci, and DENY summary judgment on the failure to protect claim for Defendants Johnson and Burgos and the due process claim for Defendant Valentin.

1

## I.    **BACKGROUND**

### A.    **Factual Background**

The following facts are drawn from the parties' Local Rule 56(a) Statements, deposition testimony, and exhibits.[1]

This action arises from an altercation that occurred upon Davis' return to the MacDougall-Walker Correctional Institution ("MWCI") on the evening of April 19, 2018 from an offsite medical appointment. Pl.'s Local Rule 56(a)(2) Statement Facts Opp'n Summ. J. ¶ 22, ECF No. 169-1 ("Pl.'s L.R. 56(a)2 St."). Eleven days before, on April 8, 2018, Davis was involved in an altercation with another prisoner and was placed in the Restrictive Housing Unit ("RHU"). *Id.* ¶ 3.

At any given time in the RHU, there are two officers on duty. Burgos Dep., ECF No. 164-9, at 9. One is the control officer and the other is a "rover," whose job it is to tour the housing unit every 15 minutes. *Id.* At his deposition, Davis explained that he and Corrections Officer LaMountain interacted for the first time in the RHU on April 9, 2018. Davis Dep., ECF 169-2, at 16. Davis said that after he was falsely accused of assaulting a corrections officer, LaMountain told Davis that "[w]here I come from, we would fuck up inmates for that." *Id.* at 46. According to Davis, LaMountain refused to give him a towel in the shower and over the days that followed harassed and threatened him by making comments to him and turning over his tray. *Id.* at 3-6. Davis said that on April 12, 2018, he told Captain Paine that he was being harassed by an officer, and Paine responded that he would email Captain Burgos. *Id.* at 5-6.

---

[1] When Davis admits a fact stated in Defendants' Local Rule 56(a)1 Statement, I cite only to the Plaintiff's Local Rule 56(a)2 Statement admitting that fact as true. *See* Pl.'s L.R. 56(a)2 St., ECF No. 169-1. Citations to the Local Rule 56(a) Statements are by paragraph number. With respect to other documents, page citations are to the page number generated by the ECF system.

Davis said that Burgos came to the RHU, but LaMountain was away from the RHU for several days and Burgos took no further action. *Id.* at 6. Davis explained that the harassing behavior resumed when LaMountain returned to the RHU on April 16 or 17. *Id.*

On April 18, 2018, while Davis was still in the RHU, LaMountain informed Davis he would be receiving a cellmate. Pl.'s L.R. 56(a)2 St. ¶ 4. Defendants assert that Davis was unwilling to comply with an order by LaMountain for Davis to "cuff-up" in advance of receiving a cellmate. Defs.' L.R. 56(a)2 St ¶ 5. Davis maintains he was never asked to "cuff up." Pl.'s L.R. 56(a)2 St. ¶ 6. That day, LaMountain issued Davis a disciplinary report for the alleged refusal to "cuff up." *Id.* ¶ 6.

On the morning of April 19, 2018, Davis was brought to the Admitting and Processing area ("A&P") of MWCI in preparation for an outside medical appointment. Pl.'s L.R. 56(a)2 St. ¶ 7. After arriving there, he spoke with Captain Johnson and reported being harassed by a second shift officer in the RHU. *Id.* ¶¶ 8, 9. At his deposition, Davis said he told Johnson that LaMountain was "threatening [his] life." Davis Dep., ECF 169-2, at 8. Davis said he told Johnson: "Listen, I ain't letting nobody do nothing to me." *Id.* Davis stated that he told Johnson some information about LaMountain—that his name was "pretty long" and started with "Lamont" or something like that. *Id.* at 31. Davis concluded that Johnson understood which officer he was referring to, based on his description. *Id.* at 30-31. Davis said that he explicitly told Johnson that the officer threatening him was the person who had given him a ticket the night before. *Id.* at 71-72. According to Davis, Johnson told Davis that he would tell Captain Burgos, the second shift captain, about his concerns. *Id.* at 8. In her report written the same day, Johnson acknowledged that Davis told her an officer was harassing him while he was being housed in the RHU but that Davis was unable to provide the officer's name. Report, ECF

164-6, at 2. At her deposition, Johnson said that Davis told her that a second shift officer was harassing him and he wanted someone to do something about it. Johnson Dep., ECF 164-7, at 7. Johnson said that Davis did not describe the officer in any way and the officer could have been any one of more than one hundred officers that worked the second shift. Johnson Dep., ECF 169-5, at 4. Johnson said she asked no follow-up questions to get a better description of the officer Davis was complaining about. *Id.* at 4.

Following Davis' departure for his offsite medical appointment, and after Captain Burgos, the second shift captain, arrived for his shift, Johnson relayed Davis' complaint to Burgos. Pl.'s L.R. 56(a)2 St. ¶¶ 10, 11. At his deposition, Burgos stated that, based on his conversation with Johnson, he interpreted Davis' comment as "borderline threatening" towards staff. Burgos Dep., ECF 164-9, at 11. Burgos was unable to address the complaint with Davis directly after speaking with Johnson, as Davis had not yet returned from his offsite medical appointment. Pl.'s L.R. 56(a)2 St. ¶ 16. Burgos then phoned the RHU and spoke with LaMountain and the other officer on duty at the RHU. *Id.* ¶ 13. Burgos told LaMountain that Davis was complaining about a second shift officer. Burgos Dep., ECF 169-6, at 6. He advised LaMountain to "use caution while managing" Davis. Pl.'s L.R. 56(a)2 St. ¶ 14. Burgos said that during the conversation LaMountain informed Burgos that he had issued Davis a disciplinary ticket the night before. Burgos Dep., ECF 169-6, at 6. Burgos stated that, following this conversation, he concluded that Davis' complaint did not relate to LaMountain. *Id.* LaMountain, by contrast, stated in his deposition that, although Burgos did not specifically say who Davis was complaining about, LaMountain "inferred" that Davis' complaint to Burgos was about LaMountain. LaMountain Dep., ECF 164-4, at 13-14. LaMountain explained that "when [inmates] get a ticket they're not happy about it." *Id.* at 14. According to

Davis, it was known at the prison that LaMountain had a history of prisoners complaining about his conduct. Davis Dep., ECF No. 169-2, at 78.

At approximately 6:55 pm on the evening of April 19, Davis returned to MWCI and was put into the A&P bullpen prior to being strip searched and returned to his unit. Pl.'s L.R. 56(a)2 St. ¶¶ 20, 22. Defendant Koza, an officer working in the A&P area, placed a call to the RHU to request that an officer, the "rover," come to A&P to escort Davis back to his unit, and LaMountain came to the A&P bullpen to do so. *Id.* ¶¶ 21, 23. As Koza was finishing his strip search of another prisoner, he called on Davis to exit the bullpen to be strip searched in the processing area. *Id.* ¶ 24.

As Davis approached the processing area, "he had a verbal exchange with Defendant LaMountain, and the two became involved in a physical altercation." *Id.* ¶ 25. The parties dispute how the physical altercation began. Davis says that LaMountain hit him twice in the side, at which point Davis turned to ask LaMountain why he hit him and LaMountain wrestled Davis to the floor. Pl.'s L.R. 56(a)2 St., Add'l Material Facts, ¶¶ 25-26. Davis says that he was 57 years old at the time of the incident and had a nearly crippled and limp left arm caused by a gunshot wound. *Id.* ¶ 28-29. Davis further asserts that none of the responding officers saw the beginning of the incident. *Id.* ¶¶ 30-33, 35.

At his deposition, Koza acknowledged he did not see how the altercation began. Koza Dep., ECF 164-10, at 8. He said he saw LaMountain and Davis go to the ground. *Id.* Koza observed Davis place LaMountain in a headlock, which he described as "lethal force," and Koza then proceeded to use closed fist strikes against Davis. *Id.* at 9. Defendant Peterson, another officer, heard a commotion, exited his office, and observed Davis and LaMountain wrestling on the ground. Pl.'s L.R. 56(a)2 St. ¶ 28. A "code" was announced in the A&P area,

signaling an assault on an officer, which resulted in the arrival of other corrections officers who subsequently used force against Davis, including Defendant McCreary, who deployed a chemical agent against Davis. *Id.* ¶¶ 29-31. Davis was then stabilized and returned to the RHU. *Id.* ¶ 32

Following the altercation, Davis was given a disciplinary report. *Id.* ¶ 33. The report, dated April 19, 2018, was written by Defendant Valentin, a Lieutenant, and stated that the physical altercation began when Davis "delivered strikes" to the right side of LaMountain's face, specifically his eye. Disciplinary Report, ECF 169-11, at 2. The report charged Davis with "Assault on DOC staff." *Id.* A related incident summary report prepared by Valentin on the night of April 19 also states that Davis delivered "strikes" to the right side of LaMountain's face, in particular his eye, and further states that LaMountain and Koza regained control and stabilized Davis to the ground, "deliver[ing] strikes to gain compliance and attempt to secure inmate Davis." Incident Summary Report, ECF 169-12, at 2. In this summary report, Valentin says that he responded to the incident and upon arrival saw officers attempting to secure Davis and using chemical agents. *Id.* The report states that "[i]t was later determined that the assault was due to a previous disciplinary report issued by Officer Lamountain." *Id.* A supplemental report prepared by Valentin on April 20, 2018 at 1:30am states that Valentin arrived on the scene after Davis was already on the ground and officers were trying to secure him. ECF No. 174-1, at 12.

On April 20, 2018 at 4:30pm, LaMountain filed a disciplinary report about the incident. Report, ECF 164-14, at 2. He explained that the altercation began after Davis approached him, "upset about [LaMountain] taking disciplinary action against him on 4/18/18." *Id.* LaMountain reported that, after he told Davis this was not the time to address the issue, Davis "attempted

to punch" LaMountain with "his left fist," at which time LaMountain "stabilized" Davis to the floor. *Id.* The video footage did not show how the incident began. ECF No. 174-1, at 10.[2]

Also on April 20, 2018, Acting Warden Roach made a recommendation to the DOC Commissioner for Davis to be placed on administrative segregation based on the incident with LaMountain. Pl.'s L.R. 56(a)2 St. ¶ 34. In his letter to the Commissioner, Roach stated that Davis approached LaMountain and "intentionally assaulted the Officer in the facial area with a closed fist." Letter, ECF 164-15, at 2. Roach stated that Davis refused to follow direction and "chemical agent was deployed to gain compliance." *Id.* Roach underscored that the assault was "intentional" and "direct" and said the request to put Davis in administrative segregation was "being made to ensure the safety of staff, inmates, to maintain the normal operations of the facility and to safely manage this inmate outside of general population." *Id.* Davis was subsequently transferred to Northern Correctional Institution ("Northern") on administrative detention status pending his administrative segregation hearing. Pl.'s L.R. 56(a)2 St. ¶ 35.

Davis received notice of his administrative segregation hearing on May 11, 2018. *Id.* ¶ 44. The hearing notice, prepared on May 10, 2018, states that on April 19, 2018 Davis "directly and intentionally assaulted a correctional employee." Notification of Hearing, ECF No. 164-15, at 2. The notice states that after an officer gave Davis a direct order to continue on to the processing area, "you struck the officer in the facial area with your fist." *Id.* The notice said: "Based on the severity of the current assault and violent conduct, Acting Warden Roach

---

[2] LaMountain also wrote an incident report on April 20 that included the same language—that Davis had "attempted" to punch LaMountain with his left fist. *See* ECF No. 174-1, at 8. The report ends by noting that LaMountain sustained "an injury to the right eye during the altercation." *Id.*

requests that you be considered for placement into a higher level of security." *Id.* Davis was at Northern when he received the notice. *Id.*

Davis attended the administrative segregation hearing on May 17, 2018, and provided an oral statement. Pl.'s L.R. 56(a)2 St. ¶ 46. Counselor Supervisor Tugie and Counselor Dow participated in the hearing. *Id.* ¶ 48. The "inmate statement" contained in the hearing paperwork is typed and unsigned. ECF No. 164-15, at 4. Davis said that he was asked questions at the hearing and provided verbal answers. Davis Dep., ECF 164-3, at 27. The statement says that after Davis was called out of the bullpen, he was hit twice in the kidney area, brought to the floor, and hit a few more times. ECF No. 164-15, at 4. The statement says: "I never in my life have assaulted a C/O" and "I give you my word, I never hit him." *Id.* The statement refers to Davis interacting with "C/O Lamont" at the shower and includes the statement "[w]here I come from we would fuck up C/Os for that." *Id.* At his deposition, Davis said he did not say that. Davis Dep., ECF 164-3, at 26. Instead, Davis said that LaMountain said to him: "We fuck inmates up who assault C/Os." *Id.* at 27.

Defendants assert that Davis identified no witnesses for the administrative segregation hearing. Defs.' L.R. 56(a)1 St. ¶ 47. Davis says that he named at least one potential witness at the time of the hearing (Leon Bell), and told prison staff to watch the video to find witnesses as there were "a bunch of inmates down there" who would have been witnesses. Pl.'s L.R. 56(a)2 St. ¶ 47; Davis Dep. 164-3, at 21-24; ECF 169-2, at 43, 53. Davis first saw a video of the incident at this deposition. Davis Dep., ECF 169-2, at 67. At that time, he was able to name another witness, Gibbs. *Id.* at 56-57, 64-65.

Following the hearing, Tugie recommended Davis for placement on administrative segregation. Pl.'s L.R. 56(a)2 St. ¶ 50. The reason for the recommendation was "due to direct

assault on a DOC employee." ECF No. 169-13, at 3. The recommendation states that the information relied upon was a memo from Roach to Defendant Maiga dated April 20, 2018,[3] the Incident Report Package MWCI 2018-04-084,[4] and the video footage of the incident. *Id.* A record of the hearing was compiled and sent to Maiga, who at that time was the DOC Director of Offender Classification and Population Management. Pl.'s L.R. 56(a)2 St. ¶ 51. Maiga approved the placement, although Davis disputes the extent to which Maiga properly reviewed the record. *Id.* ¶ 52. The placement approval, dated May 21, 2018, states: "AS placement authorized due to direct/intentional assault on DOC employee." ECF No. 169-13, at 3. Davis was put in administrative segregation for about ten months. Pl.'s L.R. 56(a)2 St. Add'l Facts ¶ 56. While on administrative segregation, Davis was confined to his cell for 23 hours a day and was only allowed one hour of exercise. *Id.* ¶ 57.

Davis was notified on April 18 and April 20, 2018 of disciplinary hearings for two disciplinary reports, one for refusing to "cuff up" and one for the altercation with LaMountain, and was then renotified on May 24 after Defendant Acus changed the charge for the LaMountain incident from assault to attempted assault. *Id.* ¶¶ 54, 55. The disciplinary hearings were held on May 31, 2018, with Acus acting as the hearing officer. *Id.* ¶¶ 56, 57. Davis was present for both disciplinary hearings and made a statement; Defendants assert that Davis identified no witnesses, but Davis says that he identified at least one potential witness and later pointed out witnesses in the video whose names he did not know. *Id.* ¶¶ 58, 59. Davis was

---

[3] No memo from Roach to Maiga appears in the record. It may be that this reference is to the letter from Roach to DOC Commissioner Quiros. ECF No. 164-15, at 2.

[4] Valentin's disciplinary report and incident report prepared on April 19, 2018 are marked with the incident number 2018-04-084. ECF No. 169-11, at 2; ECF No. 169-12, at 2.

found guilty of both violations and subsequently received notice of this finding. *Id.* ¶¶ 61, 62. Davis states that the sanctions resulting from the hearing were 30 days of punitive segregation and a reduction in 60 risk reduction earned credits. Pl.'s L.R. 56(a)2 St. Add'l Facts ¶ 66.

### B.    Procedural History

Davis filed his initial complaint on April 3, 2019, ECF No. 1, and an Amended Complaint on May 21, 2019, ECF No. 8. On October 31, 2019, the Court issued an Initial Review Order denying Davis' requests for declaratory and injunctive relief, dismissing all claims against Defendants Rinaldi and Roy, dismissing all claims against the remaining Defendants in their official capacities, and allowing a number of damages claims to proceed against the remaining Defendants in their personal capacities. ECF No. 9. After Defendants were served, they filed a Motion to Dismiss on March 13, 2020. ECF No. 27. In Spring 2020, the Court granted a stay of proceedings, and a subsequent extension of that stay until July 1, 2020, due to challenges arising from the COVID-19 pandemic. ECF No. 34. While the motion to dismiss was pending, Davis filed a motion to amend his Amended Complaint. ECF No. 53.

On November 1, 2021, the Court granted in part and denied in part Davis' Motion to Amend, allowing him to amend his pleading to add Lieutenant Valentin as a defendant to the Fourteenth Amendment procedural due process claim. ECF No. 78. The Court also granted in part and denied in part Defendants' Motion to Dismiss, terminated certain Defendants from the action, reset the schedule, and granted Davis' motion for appointment of counsel. ECF Nos. 77, 79. Davis' Second Amended Complaint was docketed on November 1, 2021. ECF No. 80. Following several motions for extension, the parties requested and received a referral to a magistrate judge for settlement discussions in late 2022. ECF Nos. 124, 125. Thereafter, the Court entered an updated scheduling order on March 9, 2023. ECF No. 135. On February

2, 2024, Defendants filed their Motion for Summary Judgment. ECF No. 164. Davis filed his response on April 15, 2024, ECF No. 169, Defendants replied on May 9, 2024, ECF No. 173, and Davis filed a sur-reply on May 27, 2024, ECF No. 177. On January 6, 2025, this case was transferred to me.[5] On July 17, 2025, I held oral argument on the motion for summary judgment. ECF No. 186.

## II.   <u>LEGAL STANDARD</u>

The Court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The nonmoving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48. The moving party may satisfy this burden by pointing out to the district court an absence of evidence to support the nonmoving party's case. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the

---

[5] The Honorable Charles S. Haight, Jr. presided over this case until September 2023, when the case was transferred to the Honorable Kari A. Dooley. ECF No. 152.

nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.*; *see also Atkinson v. Rinaldi*, 3:15-cv-913 (DJS), 2016 WL 7234087, at *1 (D. Conn. Dec. 14, 2016) (holding nonmoving party must present evidence that would allow reasonable jury to find in his favor to defeat motion for summary judgment); *Pelletier v. Armstrong*, 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007) ("[A] nonmoving party must present 'significant probative evidence to create genuine issue of material fact.'") (quoting *Soto v. Meachum*, 3:90-cv-270 (WWE), 1991 WL 218481, at *6 (D. Conn. Aug. 28, 1991)).

When deciding a motion for summary judgment, the Court may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Pelletier*, 2007 WL 685181, at *7. In reviewing the record, the Court must "construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in [his] favor." *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the nonmoving party for the issue on which summary judgment is sought, then summary judgment is improper. *See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

III.    **DISCUSSION**

A.    **Eighth Amendment Failure to Protect Claim**

Davis' complaint alleges that Defendants Burgos, Johnson, Mulligan, and McCreary failed to take reasonable measures to protect his safety against the substantial risk posed by Defendant LaMountain. Defendants do not move for summary judgment on the Eighth Amendment failure to protect claim against Defendant McCreary but do seek summary judgment on this claim for the other three Defendants.

1.    **Failure to Protect Standard**

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). "The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm. Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer*, 511 U.S. at 828).

"The first *Farmer* factor, substantial risk of serious harm, depends not on the officials' perception of the risk of harm, but solely on whether the facts, or at least those genuinely in dispute on a motion for summary judgment, show that the risk of serious harm was substantial." *Lewis v. Siwicki*, 944 F.3d 427, 431-32 (2d Cir. 2019). The subjective state of mind required by the second *Farmer* factor "is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Farmer*, 511 U.S. at 839-40). This requires "that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.*

(citing *Farmer*, 511 U.S. at 836-37). "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844 (citations omitted).

### 2.    Johnson and Burgos

Davis asserts that there are multiple material issues of fact that preclude summary judgment against Johnson and Burgos. In particular, Davis argues that Johnson and Burgos not only failed to adequately investigate Davis' concern that he was being threatened but took actions that exacerbated the risk rather than taking reasonable steps to protect Davis. Pl.'s Mem. Law Opp'n Defs.' Mot. Summ. J.Pl.'s Opp'n 10, ECF No. 169 ("Pl.'s Mem."). Defendants argue that Johnson and Burgos lacked the subjective knowledge and intent required for a claim of deliberate indifference. Specifically, they maintain that Johnson believed she did all she was required to do and Burgos, while believing Davis was not in danger, nonetheless investigated his allegations. Construing the evidence in the light most favorable to the non-moving party, and drawing all reasonable inferences in Davis' favor, I agree with Davis that there are genuine disputes of material fact regarding his failure to protect claim against Johnson and Burgos.

Under the first prong of the *Farmer* test, a reasonable factfinder could infer that Davis was indeed "incarcerated under conditions posing a substantial risk of serious harm." *Lewis*, 944 F.3d at 432. Davis maintains that LaMountain had repeatedly harassed him and threatened his life. According to Davis, Burgos may have exacerbated that risk by directly informing LaMountain of Davis' complaint. Davis was assaulted by LaMountain the same day he

expressed fear for his life. There is a genuine dispute of material fact as to whether there was a substantial risk of harm to Davis. Indeed, Defendants do not appear to argue otherwise.

As to the second prong of the *Farmer* test, I conclude that there is a genuine dispute of material fact as to whether Johnson and Burgos acted or failed to act reasonably while actually aware of a substantial risk that serious harm would result. *Farmer*, 511 U.S. at 844.

The parties agree that Davis informed Johnson that he was being harassed by an officer on the second shift, Pl.'s L.R. 56(a)2 St. ¶ 9, and that Johnson relayed this information to Burgos, *id.* ¶ 11. Davis says he told Johnson that the second-shift officer had threatened his life and he feared the officer would harm him. Davis Dep., ECF No. 169-2, at 8, 72. According to Davis, he told Johnson the "closest name that I could get to . . . . His name starts with a L. It's pretty long, Lamont (phonetic) or something like that. That's what I told her." *Id.* at 31. Davis concluded that Johnson understood which officer he was referring to, based on his description. *Id.* at 30. Johnson acknowledged that Davis said he was being threatened and he wanted someone to do something about it. Johnson Dep., ECF No. 164-7, at 7. Johnson said that the information was vague and she asked no follow up questions to better identify the officer in question. Johnson Dep., ECF No. 169-5, at 2. According to Johnson, she didn't need to do anything other than relay the information to Burgos. *Id.* Yet after Johnson relayed the information, Burgos' impression was that Davis was making a "borderline threat" to the officer. Burgos Dep., ECF No. 169-6, at 3. These circumstances raise an issue of fact regarding whether Johnson acted intentionally or recklessly in taking basic steps to investigate Davis' complaint despite knowing the risk he was under and in miscommunicating Davis' concern to Burgos in a manner that exacerbated the risk to Davis.

Burgos knew that Davis was housed in RHU and that there were only two second shift officers assigned to RHU. Burgos Dep., ECF No. 169-6, at 4. After speaking with Johnson, he decided to call those officers and tell them Davis had made a complaint against an officer and they should manage Davis "with caution." *Id.* at 6. LaMountain knew when Burgos called that Davis was complaining about him. LaMountain Dep., ECF No. 164-4, at 13-14. LaMountain told Burgos that he had written Davis a ticket the night before. Burgos Dep., ECF No. 169-6, at 6. Davis said that he told Johnson that the officer threatening him was the person who had given him a ticket the night before, Davis Dep., ECF No. 169-2, at 71-72, and Johnson said she relayed Davis' complaint to Burgos, Johnson Dep., ECF No. 169-5, at 2-3. According to Davis, it was known at the prison that LaMountain had a history of prisoners complaining about his conduct. Davis Dep., ECF No. 169-2, at 78. Yet Burgos maintained that following his conversation with LaMountain he had concluded LaMountain was not the person Davis feared. Burgos Dep., ECF No. 169-6, at 6. Protocols exist within DOC for separating certain prisoners from certain officers. Pl.'s L.R. 56(a)2 St., Add'l Facts, ¶ 69. However, Burgos took no steps to prevent LaMountain from having contact with Davis. Instead, LaMountain was permitted to be the rover escorting Davis that same night. Thus, construing all facts in Davis' favor, Burgos in fact knew LaMountain had threatened Davis' life and yet took no steps to protect Davis—instead exacerbating the risk to Davis by communicating the complaint to LaMountain. Given these circumstances, there is a genuine issue of material fact regarding whether Burgos' management of the investigation and supervision of this situation recklessly failed to protect Davis from harm.

Defendants point to a case from the Southern District of New York for the proposition that "communicating vague concerns of future assault by unknown individuals [is] not

sufficient to impose liability on an officer who fails to protect an inmate." Defs.' Mem. Supp. Mot. Summ. J. ("Defs.' Mem.") 14 (quoting *Rivera v. State of N.Y.*, No. 96 CIV. 7697 (RWS), 1999 WL 13240 (S.D.N.Y. Jan. 12, 1999)). But here, unlike in *Rivera*, Davis alleges that he expressed particularized concerns of harm regarding an identified individual. There is a genuine dispute of material fact as to whether Davis did sufficiently identify LaMountain as a serious threat to his safety. In such circumstances, the Second Circuit has held that granting summary judgment is improper. In *Hayes v. New York City Department of Corrections*, 84 F.3d 614 (2d Cir. 1996), the Second Circuit reversed the district court's grant of summary judgment for a prison captain, concluding that the plaintiff, Hayes, was entitled to a trial on his claim that the captain failed to protect him from an attack after he told the captain he was concerned about his safety. 84 F.3d at 620. Although the district court had relied on its conclusion that Hayes did not "identify his enemies," the Second Circuit observed: "[W]e note that the issue is not whether Hayes identified his enemies by name to prison officials, but whether they were aware of a substantial risk of harm to Hayes. Although a prisoner's identification of his enemies is certainly relevant to the question of knowledge, it is not, necessarily, outcome determinative." *Id.* at 621. In addition, the Court reasoned that "accepting all of Hayes' deposition testimony as true, Hayes did identify the source of the threats" and Hayes was entitled to the "affirmative inference that [the captain] was aware of the source of Hayes' difficulties." *Id.* Here too, Davis is entitled to the inference that Johnson and Burgos were aware of the source of Davis' concerns.

Defendants also argue that the fact that Johnson said she "believed" she did all she needed to do and Burgos said he "believed" Davis was not in danger precludes a finding that there is a genuine issue of material fact regarding the subjective intent of these Defendants.

Def.'s Mem. 13-14. However, "[t]he state of the defendant's knowledge is normally a question of fact to be determined after trial." *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996). "Although *Farmer* requires that a plaintiff prove actual knowledge of a risk, evidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it." *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003) (citing *Farmer*, 511 U.S. at 842); *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) ("We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious."). Here, resolving all disputed issues of facts and drawing all reasonable inferences in Davis' favor, a jury could reasonably find that the risk of harm to Davis was obvious and called for action. Moreover, a jury could reasonably find that Burgos and Johnson knew Davis was concerned about LaMountain and that telling LaMountain about Davis' complaint would exacerbate the risk to Davis.

In addition, I conclude that there is a genuine dispute of material fact as to whether Burgos and Johnson's actions in response to Davis' report of potential harm were objectively reasonable. Johnson argues that simply notifying Burgos, without any investigation, was an objectively reasonable course of action. Burgos argues that speaking directly with LaMountain and naming Davis as the complainant was an objectively reasonable course of action. But Davis asserts that Johnson and Burgos failed to take simple steps to protect him. According to Davis, MWCI maintained a "separation profile" which allowed for the separation of individuals if there was a risk of violence between them. Pl.'s L.R. 56(a)2 St., Add'l Facts, ¶ 69. Davis says that Johnson and Burgos could have entered a separation profile or taken other

action to prevent Davis and LaMountain from coming into direct contact.[6] Ultimately, there are disputes about what occurred and what inferences to draw from the facts. In sum, drawing inferences and resolving all disputes in Davis' favor, a jury could reasonably conclude that Johnson and Burgos had knowledge that Davis faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate the harm. *See Hayes*, 84 F.3d at 620.

I therefore conclude that summary judgment is inappropriate at this stage regarding Johnson and Burgos.

### 3.    **Mulligan**

Defendants also argue that Defendant Warden Mulligan had no personal involvement in the events described and is not liable under theories of supervisory or vicarious liability under *Tangreti v. Bachmann*. Defs.' Mem. at 15 (citing 983 F.3d 609, 614-20). In particular, they argue that there is no genuine dispute that Mulligan was unaware of any substantial risk to Davis, "much less that he was aware of and disregarded any such risk." *Id.* at 17. In contrast, Davis argues that Mulligan's "gross negligence in supervising" LaMountain, by allowing him to have continued and prolonged private contact with incarcerated individuals despite his alleged history of assaulting those individuals, subjects Mulligan to liability for the purpose of the Eighth Amendment failure to protect claim. Pl.'s Mem. 12-13.

I agree with Defendants that there is no genuine dispute of material fact that supports an Eighth Amendment failure to protect claim against Mulligan. A "plaintiff must plead that

---

[6] Indeed, LaMountain stated that, as of the time of his deposition, there was a separation order between him and Davis. LaMountain Dep., ECF No. 169-7, at 5.

each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti*, 983 F.3d at 616 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). Davis asserts that Mulligan knew or ought to have known that LaMountain had a record of assaulting incarcerated people, and that Mulligan's policy of allowing LaMountain to interact with prisoners in private, prolonged settings unreasonably endangered Davis. Pl.'s Mem. 12-13. But Davis provides insufficient evidence that LaMountain presented this level of threat to the inmate population generally, or that Mulligan was aware of the threat. And Davis presents no evidence that Mulligan was aware of the particular problems that Davis asserted he was having with LaMountain in advance of the April 19 incident.

Davis alternatively argues that Mulligan was personally involved because he wrote a one-sided incident report that served as the basis for Davis' administrative segregation process despite having no first-hand knowledge of the incident. Pl.'s Sur-Reply 2-4. But Mulligan's role with respect to administrative segregation followed the incident and provides no evidence of his knowledge before the incident of a threat to Davis' safety. Accordingly, Mulligan is entitled to summary judgment on the failure to protect claim.

### B.    Qualified Immunity

Defendants Johnson and Burgos[7] argue they are entitled to qualified immunity on the failure to protect claim because Davis does not identify a Second Circuit case that would have placed Defendants on notice that their actions were unconstitutional. Defs.' Reply 6. Davis counters that precedents in this Circuit establish that prison officials have a duty to ensure the

---

[7] Defendants also argue that Defendants Mulligan, Acus, Maiga, and Martucci are entitled to qualified immunity on the claims against them. As I grant summary judgment for these Defendants, I do not address their qualified immunity arguments. Defendants do not make a qualified immunity argument with respect to Defendant Valetin.

safety of prisoners, that a genuine dispute of material fact exists as to whether the behavior of Johnson and Burgos was objectively reasonable, and that therefore qualified immunity does not attach to these Defendants. Pl.'s Mem. 13-14.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019) (citations omitted). Qualified immunity "affords government officials 'breathing room' to make reasonable—even if sometimes mistaken—decisions." *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012). To overcome qualified immunity, a plaintiff must show that (1) the defendant officials violated a statutory or constitutional right, and (2) the right was clearly established at the time of the challenged conduct. *Taylor v. Barkes*, 575 U.S. 822, 825 (2015).

"A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what [they are] doing violates that right." *Eaton v. Estabrook*, 144 F.4th 80, 93 (2d Cir. 2025) (internal quotation marks omitted). "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Id.* (internal quotation marks omitted). "This does not mean that 'an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" *Bangs v. Smith*, 84 F.4th 87, 96 (2d Cir. 2023) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

In *Eaton*, an excessive force case, the Second Circuit recently held that summary judgment was improper on qualified immunity grounds. The Court explained, "[h]aving concluded that a reasonable jury could find that [the defendant's] force was objectively

unreasonable, [the defendant] is entitled to qualified immunity only if, at the time of his conduct, binding case law had not articulated with sufficient specificity that such conduct was unconstitutional, either because of the novelty of the type of force or its application in a novel context." *Eaton*, 144 F.4th at 94. The Court concluded: "We do not think that [the defendant's] conduct—construing all factual disputes in [the plaintiff's] favor—was materially novel in either respect." *Id.*

I have already determined that there is a genuine dispute of material fact as to whether Johnson and Burgos in fact violated Davis' Eighth Amendment rights by failing to protect Davis. Thus, Johnson and Burgos are entitled to qualified immunity only if "binding case law had not articulated with sufficient specificity that such conduct was unconstitutional," either because of "the novelty of the type" of their actions or the ways in which their conduct arose in "a novel context." *Eaton*, 144 F.4th at 94.

It is well established under Supreme Court and Second Circuit case law that prison officials have a duty to protect the safety of prisoners. *See Farmer v. Brennan*. 511 U.S. 825, 832 (1994); *Hayes*, 84 F.3d at 620 (concluding that Eighth Amendment "requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody"). Almost 30 years ago, the Second Circuit held in *Hayes* that summary judgment for a prison captain was improper where a prisoner had told the captain he feared for his safety and a jury could infer that the captain was "aware of the source of [the prisoner's] difficulties"—even if the prisoner did not "identify his enemies" by name. *Hayes*, 84 F.3d at 621. *Hayes* stressed that the issue was not whether the plaintiff "identified his enemies by name to prison officials, but whether they were aware of a substantial risk of harm" to the plaintiff. *Id.*

Under *Hayes*, it is clearly established that a prisoner's specific identification of the person threatening him by name is not necessary where an official is aware of a substantial risk of harm to the prisoner. Indeed, courts in this Circuit have repeatedly denied summary judgment based on qualified immunity where there are disputed issues of fact about the extent of an officer's knowledge of a threat to a prisoner's safety. *See, e.g.*, *Harvin v. Cheney*, No. 3:23CV328 (MPS), 2025 WL 1616682, at *17 (D. Conn. June 20, 2025) (stating that the "qualified immunity analysis turns on factual questions about Defendants' awareness of Harvin's safety risks from being housed with Inmate 1, and so the Court cannot assess, as a matter of law, whether it was objectively reasonable for these Defendants to believe their failure to take any steps to alleviate Harvin's risk of harm did not violate the Eighth Amendment"); *Liverpool v. Davis*, 442 F. Supp. 3d 714, 735 (S.D.N.Y. 2020) (denying summary judgment based on qualified immunity where plaintiff said he warned prison officials that another prisoner planned to throw human waste at others in a holding pen); *Williams v. Marinelli*, No. 3:13-CV-1154 (MPS), 2017 WL 11473740, at *13 (D. Conn. Feb. 8, 2017) (concluding that at the time of the incident, 2010, "it was 'clearly established law' that correctional officials have a duty to protect prisoners from assaults by other inmates where they are aware of a substantial risk of such assaults" and "there is no doubt that Williams' right to protection from an assault by a cellmate after telling numerous officials of his fears of such an assault was clearly established"); *Beckles v. Bennett*, No. 05 CIV. 2000 (JSR), 2008 WL 821827, at *17-18 (S.D.N.Y. Mar. 26, 2008) (denying qualified immunity at summary judgment stage where plaintiff presented evidence that he made a prison official aware of "a specific threat to his safety and that several hours later he was seriously assaulted" by an officer, observing that "[c]ourts have found that, when an inmate informs corrections officers

about a specific fear of assault and is then assaulted, this is sufficient to proceed on a claim of failure to protect"); *Gibson v. Brooks*, 335 F. Supp. 2d 325, 335 (D. Conn. 2004) (denying summary judgment based on qualified immunity, observing that "[u]ndoubtedly, [the officers] had notice that deliberate indifference to a substantial risk of an attempt to murder Gibson would constitute a violation of the Gibson's Eighth Amendment rights" and while the defendants urged that defendants "cannot be found liable under the Eighth Amendment because they had no knowledge of a risk to Gibson's safety, that remains a question of fact to be determined by a jury"); *Rodriguez v. Connecticut*, 169 F. Supp. 2d 39, 48 (D. Conn. 2001) (denying summary judgment based on qualified immunity to officers where there was dispute about officers' awareness of risk to plaintiff by cellmate, stating that *Farmer* "clearly outlined the standard to be employed by courts when determining whether a violation of the Eighth Amendment has occurred and, in doing so, established guidelines for prison officials regarding when liability will be imposed for such violations"); *Woods v. Fitzpatrick*, No. 96 CIV. 1120 (DAB), 1999 WL 221108, at *7 (S.D.N.Y. Apr. 14, 1999) (concluding, in case where plaintiff alleged that officer was informed that he was going to be the target of a "hit" and he was subsequently attacked in the prison yard, that "[i]n light of the material facts in dispute as to the reasonableness of Defendant's conduct under the circumstances, as well as to the extent of her knowledge of the threat to Plaintiff's safety, the Court cannot find that Defendant is entitled to the qualified immunity as a matter of law") (footnote omitted).[8]

---

[8] Courts have also repeatedly denied motions to dismiss where prisoners allege that officers were aware of specific threats to their safety. *Rogers v. Salius*, 16-CV-1299 (JCH), 2017 WL 1370695, at *4-*5 (D. Conn. Apr. 13, 2017) (denying motion to dismiss where plaintiff alleged that prison officials knew of a threat prior to the assault against him); *Henry v. Cnty. of Nassau*, No. 13-CV-7427 (SJF) (ARL), 2015 WL 2337393, at *4 (E.D.N.Y. May 13, 2015) (denying motion to dismiss

In *Morgan v. Dzurenda*, 956 F.3d 84 (2d Cir. 2020), the Second Circuit reversed the district court's grant of summary judgment to a prison captain and warden where a prisoner had written to the officials expressing his fears for his safety. The Court concluded that the plaintiff "raised a question of material fact as to whether 'a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past,' such that a trier of fact could find that [officials] 'had actual knowledge of the risk' posed" by the person who had attacked the plaintiff. *Id.* at 90. Although *Morgan* was decided in 2020, after the conduct at issue in Davis' case, the Second Circuit's decision followed from *Farmer*, *Hayes*, and the long line of other cases in this Circuit concluding that officers violate the Eighth Amendment where they have knowledge of a substantial risk of harm to a prisoner and fail to take reasonable steps to avert the harm.

As has been discussed above, drawing all inferences and construing all facts in Davis' favor, Johnson knew that Davis feared for his life because of harassment by a second shift officer. She either knew who Davis was complaining about or was willfully blind to it by failing to ask Davis basic information that would have immediately revealed the officer's identity. Meanwhile, a reasonable jury could conclude that Burgos knew LaMountain was harassing and threatening Davis and yet took no steps to protect Davis—instead exacerbating the risk by communicating to LaMountain that Davis was complaining. Nothing about this

---

as to prison officials alleged to be personally involved in the decision to place plaintiff in general population rather than protective custody after threats of gang retaliation made against plaintiff); *Caldwell v. Reynolds*, No. 95-CV-1586 RSP RWS, 1997 WL 141671, at *2 (N.D.N.Y. Mar. 26, 1997) (denying motion to dismiss where plaintiff had requested protective custody because of threats to his safety and was later attacked, observing that "Caldwell need not demonstrate that he identified his enemies by name as long as he can demonstrate that [the officer] was aware of a substantial risk of harm").

factual scenario asserted by Davis is novel or usual. *Eaton*, 144 F.4th at 94. Rather, Eighth Amendment failure to protect claims routinely involve a similar factual scenario of a prisoner asserting that a prison official failed to take reasonable steps to protect him from an attack after he told the official the reasons he feared for his safety. Here, the qualified immunity analysis turns on factual questions about Burgos and Johnson's awareness of Davis' safety risks and the reasonableness of their response. Given these factual disputes, I cannot assess, as a matter of law, whether it was objectively reasonable for Burgos and Johnson to believe their actions did not violate the Eighth Amendment. *See Harvin*, 2025 WL 1616682, at *17 (denying summary judgment on qualified immunity grounds given factual disputes); *Williams*, 2017 WL 11473740, at *13 (same). Therefore, I find that summary judgment is not appropriate on qualified immunity grounds.

### C.    Fourteenth Amendment Due Process Claim

"Prisoners may . . . claim the protections of the Due Process Clause. They may not be deprived of life, liberty, or property without due process of law." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). The standard analysis under the Due Process Clause proceeds in two steps: "We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). "In the prison context—involving prisoners whose liberty interests have already been severely restricted because of their confinement—a prisoner plaintiff who complains of adverse action without due process must show that the adverse action amounted to an 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'" *Galarza v. Erfe*, No. 3:18-CV-00663 (JAM), 2019 WL 121784 (D. Conn. Jan. 7, 2019) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).

1.    **Acus**

Davis asserts that Defendant Acus, the disciplinary hearing officer who oversaw Davis'

disciplinary hearing, violated his right to Due Process by failing to conduct any independent

investigation into the credibility of the witnesses, receive statements from witnesses named by

Davis, or seek any additional witnesses. Pl.'s Mem. 19-20.

Defendants argue that Acus committed no due process violation because Davis received

notice of the disciplinary charge, was present at the disciplinary hearing, and spoke on his own

behalf. Defs.' Mem. 22. They allege that Davis identified no witnesses, that Acus reviewed

the evidence (including the video of the incident), and that Davis received notice of the guilty

findings. *Id.* Defendants further argue that Acus, as the disciplinary hearing officer, was not

Davis' advisor, and therefore it was not his role to speak to witnesses. Defs.' Reply 9.

Moreover, Defendants argue that the thirty-day punitive segregation sanction imposed by Acus

at the disciplinary hearing was not an atypical or significant hardship and therefore does not

create a liberty interest warranting due process protection. *Id.* 8-9.

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court held that confinement in

the restrictive housing unit for thirty days for disciplinary reasons did not implicate a

constitutionally protected liberty interest. *Id.* at 485-86. The Second Circuit has held that

"restrictive confinements of less than 101 days do not generally raise a liberty interest

warranting due process protection, and thus require proof of conditions more onerous than

usual." *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009). The Court has noted that "SHU

[special housing unit] confinements of fewer than 101 days could constitute atypical and

significant hardships if the conditions were more severe than the normal SHU conditions . . .

or a more fully developed record showed that even relatively brief confinements under normal

SHU conditions were, in fact, atypical." *Id.* (internal quotations omitted). Thus, "[b]oth the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999) (citation omitted). The "conditions of a prisoner's housing may independently give rise to an inference of atypicality, even if the time spent in that housing does not." *Shand v. Parsons*, No. 3:20-CV-28 (CSH), 2022 WL 2981593, at *6 (D. Conn. July 28, 2022).[9]

Courts in this Circuit have often dismissed due process claims brought by plaintiffs held for 30 or fewer days in segregation. *See, e.g.*, *Muniz v. Cook*, No. 3:20-CV-1533 (MPS), 2020 WL 7078715, at *3 (D. Conn. Dec. 3, 2020) (stating that "fifteen days in punitive segregation and ninety days loss of commissary privileges, do not constitute an atypical and significant hardship"); *Galarza v. Erfe*, No. 3:18-CV-00663 (JAM), 2019 WL 8756874, at *2 (D. Conn. Apr. 30, 2019) (holding that plaintiff "has not plausibly alleged the deprivation of a liberty interest due to his two month restrictive confinement on the Q Unit"); *Abrams v. Waters*, No. 3:17-CV-1659 (CSH), 2018 WL 691717 (D. Conn. Feb. 2, 2018) (21-day

---

[9] Davis appears to argue that the Second Circuit has adopted a more lenient standard when evaluating liberty interests for incarcerated individuals confined to restrictive housing. In *Elder v. McCarthy*, 967 F.3d 113 (2d Cir. 2020), the Second Circuit said that "requiring an inmate to serve time in the [restrictive housing unit] represents a substantial loss of liberty even for a lawfully imprisoned person." *Id.* at 124. There, the Second Circuit found that a loss of liberty was clearly implicated where the prisoner-plaintiff was "confined to a cell . . . for twenty-three hours a day," afforded "very little" exercise, and faced other harsh and punitive conditions. *Id.* at 121, 124. But in *Elder*, the incarcerated plaintiff was held in restrictive housing for six months, *id.* at 120—a length of time more likely to implicate a finding of atypicality under *Sandin*. *Elder* addressed whether the procedures provided at a disciplinary hearing complied with *Wolff v. McDonnell*, 418 U.S. 539 (1974), and it does not appear that the defendants disputed on appeal that the plaintiff was entitled to due process protections for the hearing.

confinement in segregation insufficient); *see also Smith v. Arnone*, 700 F. App'x 55, 56 (2d Cir. 2017) (summary order) (noting lack of evidence that conditions of punitive segregation "were more onerous than usual restrictive confinements" in concluding that 30-day sanction did not implicate a liberty interest); *Borcsok v. Early*, 299 Fed. Appx. 76, 78 (2d Cir. 2008) ("Even if we include the eleven days that [plaintiff] spent in SHU before the disciplinary hearing with the ninety days he received as part of his penalty, the duration of his confinement was neither atypical nor significant"); *Sealey*, 197 F.3d at 589 (holding that 101-day confinement in restrictive housing unpleasant but not atypical). Therefore, I conclude that Davis' 30-day punitive segregation alone does not demonstrate the atypicality necessary under *Sandin* to establish a liberty interest.

Defendants assert that Davis' confinement on punitive segregation was no more onerous than usual, and that none of the other sanctions imposed, including loss of commissary, visitation privileges, and phone use, "constitute atypical or significant hardships." Defs.' Reply 8-9. In addition, Defendants argue that Davis was already on administrative segregation at the time his punitive segregation was imposed. *Id.* at 8. Davis' placement in administrative segregation preceded his punitive segregation, and he does not point to any specific conditions that differed in punitive segregation as compared to the first phase of administrative segregation. In sum, I agree with Defendants that Davis has failed to establish that his sanction of 30 days in punitive segregation created a liberty interest when he was already being held in administrative segregation for that same time period.[10] I thus grant the

---

[10] The DOC Restrictive Housing Status—Provisions and Management Standards matrix, which outlines the conditions of confinement for individuals held on restrictive status, shows that incarcerated individuals placed on punitive segregation may face a lack access to programming,

motion for summary judgment on the Fourteenth Amendment Due Process claim with regard to Defendant Acus.

###    2.    Valentin

Davis alleges that Defendant Valentin violated his due process rights by filing a false disciplinary report against Davis for the April 19, 2018 altercation with LaMountain. Am. Compl. 26-27. Davis argues that the false report is actionable because Davis was denied due process at his administrative segregation hearing and Maiga relied on the report in approving Davis' placement in administrative segregation. Pl.'s Mem. 21. According to Davis, there are material issues of fact relating to the falsity of Valetin's report and its effect on Davis' administrative segregation hearing. *Id*. Defendants argue that even if Davis could demonstrate that Valentin wrote a false disciplinary report, Davis cannot demonstrate that he was disciplined without adequate due process. Defs.' Mem. 23

Valetin's disciplinary report said that Davis initiated the altercation with LaMountain by delivering strikes to LaMountain's right eye. ECF No. 169-11 at 2. This statement was repeated in the incident summary report. ECF No. 169-12, at 2. Drawing all inferences in Davis' favor, Valetin made this statement even though he was not an eyewitness to the start of the altercation and the only individuals who did witness the start of the altercation (LaMountain and Davis) provided accounts inconsistent with Valetin's report. ECF No. 164-14, at 2-3. [11]

---

visitation, and telephone access available in some circumstances to individuals placed in the first phase of administrative segregation. ECF No. 169-14. But Davis does not point to any way in which his experience actually changed when his disciplinary sanction was imposed.

[11] There is no dispute that Valetin arrived on the scene after the altercation began, and that no officer other than LaMountain saw how the altercation began. Pl.' L.R. 56(a)2 Add'l Facts ¶¶ 30-

A "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). For a false misconduct report to be actionable, the prisoner must show either "(1) that he was disciplined without adequate due process as a result of the report; or (2) that the report was issued in retaliation for exercising a constitutionally protected right." *Willey v. Kirkpatrick*, 801 F.3d 51, 63 (2d Cir. 2015) (quotation marks and citations omitted); *see also Velez v. Burge*, 483 F. App'x 626, 628 (2d Cir. 2012). Judge Haight found no basis on the record to infer a retaliatory purpose in his Order granting Davis' motion for leave to amend his complaint, *see* ECF No. 78 at 9, and Davis does not argue that Valentin acted with such a purpose. Instead, I evaluate whether Davis was disciplined without adequate due process.

The Second Circuit in *Grillo v. Coughlin*, 31 F.3d 53 (2d Cir. 1994), explained that while "it is true that we held in *Freeman* that a fair hearing, conforming to the due process standards of *Wolff*, would 'cure' a constitutional violation otherwise resulting from a false accusation," "[b]ecause [the plaintiff] has proffered evidence that he was not afforded a proper *Wolff* hearing, his claims were not properly disposed of on summary judgment." *Id.* at 56; *see also id.* ("Therefore, the proposition of *Freeman*—that any unconstitutionality inhering in a false accusation is vitiated when it is tested in a fair hearing—cannot support summary

---

35. The beginning of the incident was also not visible on the video. Incident Report, ECF No. 174-1, at 10. LaMountain's disciplinary and incident reports state that Davis "attempted to punch this officer with his left fist." ECF No. 164-14, at 2; ECF No. 174-1, at 8. Although Davis was initially charged in the disciplinary report written by Valentin with assault on an officer, this charge was later changed to attempted assault. ECF No. 169-11. Davis denies he swung at all at LaMountain and says the incident began when LaMountain hit him. Pl.'s L.R. 56(a)2 Add'l Material Facts ¶ 25.

judgment where there is evidence that the accused was not shown the allegedly spurious evidence used against him, and therefore, arguably, did not receive a fair hearing."); *Jones v. Coughlin*, 45 F.3d 677, 679 (2d Cir. 1995) ("The present case may well be factually distinguishable from *Freeman* if, as alleged, Jones was unfairly denied the right to call key witnesses in defense of the charges against him."); *Garrett v. Ask-Carlson*, No. 15 Civ. 723 (PAC) (JCF), 2016 WL 439029, at *4 (S.D.N.Y. Feb. 3, 2016) (concluding that because plaintiff "plausibly alleges he was also denied an opportunity to present a defense and rebut the charges against him" he "has plausibly alleged that Rodriguez's false accusation violated his due-process rights").

To determine if Davis' due process rights were violated in connection with his administrative segregation placement, I must consider whether Davis had a liberty interest in avoiding administrative segregation. Unlike his punitive segregation, which lasted only thirty days, Davis states that his administrative segregation lasted "ten months and a half." Davis Dep., ECF No. 169-2, at 61. This length of time would put his confinement at more than 305 days. *Palmer v. Richards*, 364 F.3d 60 (2d Cir. 2004), defined a confinement of "intermediate duration" as lasting between 101 and 305 days, while a "confinement longer than [305 days], and under 'normal SHU conditions,' is 'a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.'" *Id.* at 64-65 (quoting *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir. 2000)). Here, Davis' administrative segregation was longer than an "intermediate duration," and was therefore a "sufficient departure from the ordinary incidents of prison life" to require due process protections. Defendants have provided nothing on the record to mitigate the attendant "inference of atypicality," *Shand*, 2022 WL 2981593, at *6, provided by this more than ten-month stay in

administrative segregation. I therefore conclude that Davis had a liberty interest in avoiding the administrative segregation imposed at the hearing.

Having found such a liberty interest, I must now determine whether the procedures used by DOC were sufficient to meet the standard required by the Due Process Clause. The level of procedural protection required by Due Process in the prison context "differs according to the purpose of the confinement." *Bolden v. Alston*, 810 F.2d 353, 357 (2d Cir. 1987). If a restraint on liberty is being imposed for disciplinary reasons, an incarcerated individual is entitled to the more robust protections set forth in *Wolff*, 418 U.S. at 539, which require written notice, "adequate time to prepare a defense, a written statement of the reasons for action taken, and a limited ability to present witnesses and evidence." *Benjamin v. Fraser*, 264 F.3d 175, 190 (2d Cir. 2001) (citing *Wolff*, 418 U.S. at 561-70). If, however, an incarcerated individual is deprived of liberty for administrative reasons, for example placement in administrative detention pending completion of a misconduct investigation, he is subject to the less robust protections of *Hewitt v. Helms*, which require that he "merely receive some notice of the charges against him and an opportunity to present his views." *Id.* (citing *Hewitt*, 459 U.S. 460, 476 (1983)).

Under either level of procedural protection, the standard governing the type or amount of evidence required to support a decision to deprive an incarcerated individual of his liberty is "some reliable evidence." *Elder v. McCarthy*, 967 F.3d 113, 129-30 (2d Cir. 2020). In the Second Circuit, this mean that "a hearing officer [cannot] simply ratify the bald conclusions of others; it requires some inquiry to determine whether the totality of facts and circumstances reasonably supports the proffered conclusion." *Id.* (quoting *Sira v. Morton*, 380 F.3d 57, 80 (2d Cir. 2004)).

I conclude that there is a disputed issue of fact regarding whether the purpose of the hearing that led to administrative segregation was punitive or administrative. Maiga, who ultimately approved the placement, denied any punitive reasoning behind his decision to send Davis to administrative segregation. *See* Maiga Dep., ECF No. 164-16, at 10 ("I do not impose punitive sanctions on inmates."). Moreover, the letter by Acting Warden Roach requesting that Davis be placed on administrative segregation said that "[t]his recommendation is being made to ensure the safety of staff, inmates, to maintain the normal operations of the facility and to safely manage this inmate." Letter, ECF No. 164-15, at 2. However, there can be little question that the incident with LaMountain triggered the request for administrative segregation placement and the hearing that followed. Indeed, the initiation of the hearing and the placement decision explicitly relied on Valetin's statement in his report that the altercation began when Davis, unprovoked, punched LaMountain in the face with his fist. Valetin included that statement in both a disciplinary report and report summarizing the incident. ECF No. 169-11, at 2; 169-12, at 2. Roach's letter requesting the administrative segregation placement states that Davis approached LaMountain and "intentionally assaulted the Officer in the facial area with a closed fist." ECF No. 164-15, at 2. The "Reason for Hearing" provided in the "Notification of Hearing" for administrative segregation states "you struck the officer in the facial area with your fist." *Id.* at 3. The only reason provided for the authorization of the administrative segregation placement was "due to the direct/intentional assault on DOC employee." *Id.* at 5.

Given the timing of the administrative segregation hearing, and its specific reliance on a report which alleged that Davis punched LaMountain in the face without provocation, a jury could reasonably infer that prison officials acted with the purpose of punishing Davis for what

the officers perceived to be an assault on staff, rather than for non-punitive administrative purposes. Drawing all inferences for the non-moving party, as I must do at this stage of the litigation, there is a genuine issue of material fact as to whether the initiation and approval of the administrative segregation was for punitive reasons. *Sealey v. Giltner*, 116 F.3d 47, 52-53 (2d Cir. 1997) (remanding to district court to consider whether confinement labeled as administrative "was disciplinary in nature," requiring more than the informal procedures outlined in *Hewitt*, given prison administrator had placed prisoner on administrative segregation despite the fact all disciplinary charges had been dismissed); *Ellerbe v. Jasion*, No. 3:12-cv-00580 MPS, 2015 WL 1064739, at *5 (D. Conn. Mar. 11, 2015) ("Ellerbe alleges that the Administrative Segregation was imposed as a punishment, and in the absence of a factual record, the Court has no basis to conclude otherwise."); *Allah v. Milling*, 982 F. Supp. 2d 172, 183 (D. Conn. 2013) (concluding "there is a genuine issue of material fact regarding whether the plaintiff's re-assignment to administrative segregation in October 2010 constituted punishment"). I therefore conclude that, for the purpose of the summary judgment stage, the higher *Wolff* standard for due process applies.[12]

Defendants argue that even under the *Wolff* standard, Davis received adequate process. Under *Wolff*, due process protections include providing the prisoner with "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition,

---

[12] In addition, although the Second Circuit has held that a hearing with *Wolff* procedures can cure a false misconduct report, *Grillo*, 31 F.3d at 56, it has not stated that a hearing with *Hewitt* procedures can have such an effect.

including supporting facts and reasons for the action taken." *Smith v. Fischer*, 803 F.3d 124, 127 (2d Cir. 2015).

"As the Supreme Court has observed, '[c]hief among the[se] due process minima . . . [i]s the right of an inmate to call and present witnesses . . . in his defense before the disciplinary board.'" *Elder*, 967 F.3d at 124 (quoting *Ponte v. Real*, 471 U.S. 491, 495 (1985)). "An inmate's request to call witnesses may be denied due to 'irrelevance or lack of necessity,' or where 'granting the request would be unduly hazardous to institutional safety or correctional goals.'" *Id.* (quoting *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991)). The burden to defend such a denial, however, "is not upon the inmate to prove the official's conduct was arbitrary and capricious, but upon the official to prove the rationality of the position." *Kingsley*, 937 F.2d at 30-31.

Here, as in *Elder* and *Kingsley*, there is a genuine dispute of fact as to whether Davis was afforded a reasonable opportunity to call witnesses. Defendants claim that Davis "did not identify any witnesses for his administrative segregation hearing." Defs.' L.R. 56(a)1 St. ¶ 47 (citing Davis Dep., ECF No. 164-3, at 24). But Davis argues that he did name potential witnesses, including another prisoner, Leon Bell, and other prisoners who were present in the A&P area at the time of the incident and who might be identified in the video footage of the incident but whose "government" names he did not know. Pl.'s L.R. 56(a)2 St. ¶ 47; Davis Dep. 164-3, at 21-24; ECF 169-2, at 43, 53. When for the first time he viewed video footage of the incident at his deposition, Davis was able to identify another potential witness by name. Davis Dep., ECF 169-2, at 56-57, 64-67.

Moreover, the Second Circuit held in *Kingsley* that a hearing officer's insistence that a prisoner identify witnesses by name was unreasonable where "where the need for the witnesses

was especially compelling, their identities were readily available to the prison officials, and [the plaintiff's] inability to identify them by name was understandable in view of his arrival at the prison only five days earlier." *Kingsley*, 937 F.2d at 31 & n.6; *see also Elder*, 976 F.3d at 131 ("We established in *Kingsley* that a hearing officer is required to identify the witnesses an inmate seeks to call using 'readily available' prison records, even where the inmate cannot 'identify [the witnesses] by name') (citations omitted).

In addition, as *Elder* explained, prison authorities are required to provide assistance to a prisoner in marshalling evidence and presenting a defense, and when an individual is "confined before the hearing 'the duty of assistance is greater because the inmate's ability to help himself is reduced.'" *Elder*, 967 F.3d at 126 (quoting *Eng v. Coughlin*, 858 F.2d 889, 897 (2d Cir. 1988)). The obligation is violated by a failure to "interview an inmate's requested witnesses without assigning a valid reason." *Id.* (internal quotation marks omitted). Finally, a prisoner has a "right to know the evidence upon which a discipline ruling is based" as "[s]uch disclosure affords the inmate a reasonable opportunity to explain his actions and to alert officials to possible defects in the evidence." *Sira v. Morton*, 380 F.3d 57, 74 (2d Cir. 2004).

Here, a list of potential witnesses was readily available to prison officials, because prisoners being processed into or out of the A&P were recorded in the "Admission/Discharge" list. The list for April 19, 2018, for example, included both Davis and the prisoner he identified, Leon Bell, on the discharged and admitted lists, along with more than a dozen other potential witnesses. ECF No. 169-8, at 2-3; ECF No. 169-10, at 2. These records would have been easily accessible and would have permitted the hearing officer to follow up with specific potential witnesses, including the one that Davis named. There is no showing on the administrative segregation hearing record that the hearing officer made any attempt whatsoever to identify

any of these possible witnesses, based on the video footage or the list of potential witnesses at the A&P area that was readily available to her. In addition, Davis was not given the chance to see the video of the incident—which would have helped him to identify witnesses and to explain his actions—and he asked the administrative segregation hearing officer to do so. Davis Dep., ECF No. 169-2, at 43, 67.

Furthermore, as in *Kingsley*, there was a compelling need for additional witness testimony because Davis and the Defendants provided conflicting testimony about the events and Davis' inability to identify those witnesses was understandable as a result of his relatively recent transfer to MWCI. Davis Dep., ECF No. 169-2, at 34. Moreover, Davis had no ability to locate the witnesses and gather their statements himself as he was transferred to administrative detention at Northern—a different facility from where the incident occurred— shortly after the incident. *Id.* at 88-89. Instead, the hearing officer simply relied on the statement of Valetin regarding the incident and did not interview LaMountain. LaMountain Dep., ECF No. 169-7, at 5.

Because Davis has presented facts showing the hearing officer's effort to identify relevant witnesses was "patently insufficient," *Elder*, 967 F.3d at 125, I find that there is a genuine dispute of material fact as to whether Davis' due process rights were violated by his lack of access to witness testimony at his administrative segregation hearing.

Having concluded there is a material issue of disputed fact regarding the violation of Davis' due process rights at the administrative segregation hearing, I conclude that Davis' false misconduct report claim against Valentin is actionable. The hearing officer and Maiga (who approved the placement) explicitly relied on "Incident Report Package MWCI-2018-04-084," which included a disciplinary report and incident summary report by Valentin that make the

38

same claims about the precipitating incident—i.e., that Davis initiated the altercation by delivering strikes to LaMountain's right eye. ECF Nos. 169-11 at 2; 169-12, at 2; 169-13, at 2. Drawing all inferences in Davis' favor, this version of events was not actually witnessed by Valetin and is inconsistent with the eyewitness account of the start of the altercation provided by LaMountain in his incident and disciplinary reports and Davis. *See supra* note 11. As noted above, the letter initiating the administrative segregation process and the hearing notice repeat the version of events provided by Valetin. Moreover, the sole reason provided for the administrative segregation recommendation is "direct assault on a DOC employee," and the sole reason for administrative segregation placement is the "direct/intentional assault on DOC employee." ECF No. 169-13, at 3. These facts support a reasonable inference that Davis' administrative segregation hearing was based at least in part on Valentin's report, including the allegation that Davis initiated the altercation by punching LaMountain without provocation.

Accordingly, because there is a genuine dispute of material fact as to whether Davis was placed in segregation for ten months based on a false report and without due process, I deny the motion for summary judgment on the Fourteenth Amendment Due Process claim as regards Defendant Valentin.

### 3. Maiga

Davis also alleges that Defendant Maiga, former DOC Director of Offender Classification and Population Management, violated his procedural due process rights. Am. Compl. at 14. Defendants argue that Maiga had no direct role in the hearing process, having only reviewed the record of the hearing and subsequently approving it based on that review, and that the hearing record contained no obvious due process concerns. Defs.' Mem. 21. Davis

counters that there are "sufficient facts in dispute to show that Defendant Maiga may have denied [Davis] a fair hearing and due process," because Maiga assigned Tugie as the hearing officer. Pl.'s Mem. 17. Davis asserts that Tugie did not call any of Davis' witnesses, did not engage in any reasonable investigation to find or consider any statements from any witnesses other than prison officials, did not properly assess the reliability of these officials' statements, and reached a recommendation that was not based on "some reliable evidence." *Id.* at 17-18. Davis alleges that Maiga's review of this record, given these issues, was therefore clearly lacking. *Id.* at 18.

As an initial matter, Defendants say that Davis is improperly raising this claim against Maiga for the first time in his opposition memorandum. Defs.' Reply 7. Davis argues that the second amended complaint in fact gave Maiga fair notice of this claim. Pl.'s Sur-Reply 4. I agree with Davis that the allegations regarding Maiga's review of the administrative segregation hearing are properly raised at this stage of the litigation. Davis' pro se second amended complaint generally asserts that Maiga "is legally responsible for violating the Plaintiff's Procedural Due Process rights . . . by authorizing his Administrative Segregation placement in Northern C.I." Am. Compl. 14. This was sufficient to put Maiga on notice that Davis claimed that Maiga's involvement in reviewing the hearing, and not just Maiga's alleged failure to provide notice of the hearing, were violations of Davis' procedural due process rights. Indeed, Defendants' memorandum in support of summary judgment argues that Maiga's role reviewing and authorizing the finding of the hearing did not amount to a due process violation, suggesting that Defendants understood and had notice of Davis' allegations. Defs.' Mem. 21.

Next, Maiga argues that he was not "personally involved" in the "actual status hearing during which the plaintiff claimed to have been denied due process." Defs.' Mem. 20-21. But DOC's Administrative Directive (A.D.) 9.4[13] lays out the responsibilities for the Director of Offender Classification and Population Management, which is the title held by Maiga at the time of the incident. A.D. 9.4 instructs that "[p]lacement of an inmate on Administrative Segregation Status shall be at the discretion of the Director of Offender Classification and Population Management." A.D. 9.4 § 12.A, ECF No. 164-17. The Director of Offender Classification and Population Management appoints an officer to conduct administrative segregation hearings. *Id.* § 12.B. That officer holds a hearing and makes a written recommendation. *Id.* § 12.D. At that point, a "decision shall be made *by the Director of Offender Classification and Population Management*" as to whether the incarcerated individual is put on administrative segregation. *Id.* § 12.E (emphasis added). Defendants' argument that Maiga was not personally involved is therefore unconvincing, especially in the face of other cases in this district that have found personal involvement by the Director of Offender Classification and Population Management in the administrative segregation placement process under other circumstances. *See, e.g.*, *Allah v. Milling*, 982 F. Supp. 2d 172, 180-83 (D. Conn. 2013); *Milner v. Lewis*, No. 3:14CV1544(VLB), 2017 WL 1024268 (D. Conn. Mar. 16, 2017).

However, despite Maiga's direct involvement in approving the administrative segregation placement, Davis has not provided sufficient evidence for a jury to reasonably find

---

[13] I here refer to the version of Administrative Directive 9.4 which was operative at the time of the hearing, which is included with the Defendant's Motion for Summary Judgment as Exhibit O.

that Maiga, through his "own individual actions, has violated the Constitution." *See Tangreti*, 983 F.3d at 618.

Davis argues that his due process rights were violated when he was not afforded a reasonable opportunity to call witnesses. He argues that he named potential witnesses, but that the hearing officer did not attempt to find and interview those witnesses. But Davis' arguments, which establish a genuine dispute of material fact as to whether he was denied proper access to witnesses in his administrative segregation hearing, do not show personal involvement in those deprivations by Maiga. Davis' arguments about Maiga's culpability are premised on the fact that "Maiga assigned Counselor Supervisor Tugie to act as Plaintiff's ad seg hearing officer" and Maiga "made the ad seg determination based on Tugie's recommendation and his review of the record." Pl.'s Mem. 17-18. Although Davis argues that "even a cursory review of the record should have shown Maiga that [Davis] did not enjoy a fair hearing" because Tugie did not assess witness reliability or seek out any statement from any witness identified by Davis, *id.*, Davis does not provide sufficient facts from which a jury could reasonably infer that Maiga should have realized these issues. The administrative segregation paperwork included a recommendation by Tugie, the rationale for that recommendation ("direct/intentional assault on DOC employee"), a list of the information relied on at the hearing, a copy of the notice given to Davis by Maiga's staff, Davis' statement, and several blank spaces indicating that no witnesses were called. *See* ECF No. 169-13, at 2. Maiga stated at his deposition that he did not see any due process violation on the face of the record. Maiga Dep., ECF No. 169-4, at 2-5.

In short, on the facts presented, Maiga was involved in the decision to place Davis on administrative segregation, but Davis has not raised sufficient facts to assert a genuine dispute

of material fact on whether Maiga was involved in or aware of any due process violation regarding access to witnesses.

Finally, Davis does not contest that he received notice of the administrative segregation hearing more than a week before it was held. Pl.'s L.R 56(a)2 St. ¶ 44. Although Judge Haight allowed this claim to proceed to discovery because Maiga might have played a central role in denying Davis' due process rights by failing to provide Davis with notice of the administrative segregation hearing, with the benefit of discovery it is clear there is no dispute that Davis received notice of the administrative segregation hearing, as was required for due process.

I therefore grant the motion for summary judgment on the Fourteenth Amendment due process claim with regard to Defendant Maiga.

### 4.    Martucci

Finally, Davis asserts that Defendant Martucci, who Davis initially claimed was the hearing officer at the administrative segregation hearing, violated his due process rights by refusing to call witnesses to testify on Davis' behalf. Am. Compl. at 15.

Defendants argue that Martucci had "no involvement whatsoever in [Davis'] administrative segregation hearing" as she "was not [Davis'] administrative segregation hearing officer," "has never been an administrative segregation officer," and was "never . . . involved in [Davis'] placement in administrative segregation." Defs.' Mem. 20. Defendants therefore argue that Davis cannot establish Martucci's personal involvement under the *Tangreti* standard, and that Defendant Martucci cannot be liable for any due process violation. *Id.* 15-17; 20-21.

Davis does not contest these arguments or the underlying facts. *See* Pl.'s Mem. 17-22; Pl.'s L.R. 56(a)2 St. ¶ 49. He seems to have abandoned his claim against Martucci, making no

further arguments in his opposition or sur-reply briefs opposing summary judgment for Martucci. Based on the evidence before me, I find no genuine dispute of material fact that Martucci was in any way involved with the administrative segregation proceedings at issue in this case. *See* Martucci Decl., ECF No. 164-18. Accordingly, she cannot be held liable for any violation of Davis' due process rights and I therefore grant the motion for summary judgment as regards Martucci.

## IV.   <u>CONCLUSION</u>

Summary judgment is hereby GRANTED as to the failure to protect claim for Defendant Mulligan and the due process claim for Defendants Acus, Maiga (entered as "Maigo" in the case caption), and Martucci, and DENIED on the failure to protect claim for Defendants Johnson and Burgos and the due process claim for Defendant Valentin. The Clerk of Court is directed to terminate Defendants Mulligan, Acus, Maiga, and Martucci from this action.

**SO ORDERED.**

New Haven, Connecticut
August 19, 2025

/s/*Sarah F. Russell*_____
SARAH F. RUSSELL
United States District Judge
